**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **IN RE: GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION** _____ | **MDL 2724 16-MD-2724 HON. CYNTHIA M. RUFE** |
| **IN RE:  LIDOCAINE-PRILOCAINE CASES** _____ | **LEAD CASE: 16-LD-27240 END-PAYER CASE: 16-LD-27242** |
| **THIS DOCUMENT RELATES TO:** | |
| *ALL END-PAYER ACTIONS* _____ | **JURY TRIAL DEMANDED** |
| 1199SEIU NATIONAL BENEFIT FUND; 1199SEIU GREATER NEW YORK BENEFIT FUND; 1199SEIU NATIONAL BENEFIT FUND FOR HOME CARE WORKERS; 1199SEIU LICENSED PRACTICAL NURSES WELFARE FUND; THE CITY OF PROVIDENCE, RHODE ISLAND; LOUISIANA HEALTH SERVICE & INDEMNITY COMPANY d/b/a BLUE CROSS AND BLUE SHIELD OF LOUISIANA AND HMO LOUISIANA, INC.; PHILADELPHIA FEDERATION OF TEACHERS HEALTH AND WELFARE FUND; SELF-INSURED SCHOOLS OF CALIFORNIA; SERGEANTS BENEVOLENT ASSOCIATION OF THE POLICE DEPARTMENT OF THE CITY OF NEW YORK HEALTH AND WELFARE FUND; and UNITE HERE HEALTH, on behalf of themselves and all others similarly situated, | **CONSOLIDATED AMENDED END-PAYER CLASS ACTION COMPLAINT** |
| Plaintiffs, | |
| v. | |
| AKORN, INC.; AKORN SALES, INC.; FOUGERA PHARMACEUTICALS INC.; HI-TECH PHARMACAL CO., INC.; IMPAX LABORATORIES, INC.; and SANDOZ INC., | |
| Defendants. | |

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

## <u>TABLE OF CONTENTS</u>

I.     NATURE OF THE ACTION ........................................................................ 1

II.    ONGOING FEDERAL AND STATE INVESTIGATIONS ............................... 5

III.   JURISDICTION AND VENUE ................................................................ 10

IV.   PLAINTIFFS ....................................................................................... 11

V.    DEFENDANTS .................................................................................... 17

VI.   CO-CONSPIRATORS ........................................................................... 19

VII.  INTERSTATE AND INTRASTATE TRADE AND COMMERCE ................... 19

VIII. BACKGROUND OF THE GENERIC DRUG INDUSTRY ............................ 20

     A.   Generic Drugs Are Commodity Products .................................... 20
     B.   Pricing in the U.S. Prescription Drug Industry ......................... 23

IX.   THE GENERIC LIDOCAINE-PRILOCAINE CONSPIRACY ....................... 26

     A.   Congressional Responses to Generic Drug Price Increases ...................... 26
     B.   The Generic Lidocaine-Prilocaine Market ................................. 27
     C.   Generic Lidocaine-Prilocaine Price Increases ........................... 31
     D.   Defendants' Conspiracy ............................................................ 38
     E.   Defendants' Concerted Efforts to Increase Prices for Generic Lidocaine-Prilocaine Yielded Supracompetitive Profits ........................................................ 50
     F.   Factors Increasing the Market's Susceptibility to Collusion ................... 50

          1.   Industry Concentration ..................................................... 50
          2.   Barriers to Entry ............................................................ 51
          3.   Demand Inelasticity ......................................................... 52
          4.   Lack of Substitutes .......................................................... 53
          5.   Standardized Product with High Degree of Interchangeability ........ 54
          6.   Inter-Competitor Contacts and Communications ..................... 55

X.    THE STATUTES OF LIMITATIONS DO NOT BAR PLAINTIFFS' CLAIMS .......... 63

     A.   The Statutes of Limitations Did Not Begin to Run Because Plaintiffs Did Not and Could Not Discover Defendants' Unlawful Conspiracy ......................... 63
     B.   Fraudulent Concealment Tolled the Statutes of Limitations .................. 65

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

       1.     Active Concealment of the Conspiracy ........................................ 66

       2.     Plaintiffs Exercised Reasonable Diligence ................................. 67

XI.     CONTINUING VIOLATIONS ........................................................................ 68

XII.    DEFENDANTS' ANTITRUST VIOLATIONS................................................. 68

XIII.   CLASS ACTION ALLEGATIONS ................................................................ 71

XIV.   CAUSES OF ACTION ................................................................................... 75

FIRST COUNT:  Violation of Sections 1 and 3 of the Sherman Act
(on behalf of Plaintiffs and the Nationwide Class) ........................................... 75

SECOND COUNT:  Violation of State Antitrust Statutes (on behalf of
Plaintiffs and the Damages Class) ..................................................................... 77

THIRD COUNT:  Violation of State Consumer Protection Statautes
(on behalf of Plaintiffs and the Damages Class)................................................ 99

FOURTH COUNT:  Unjust Enrichment (on behalf of Plaintiffs and the
Damages Class)................................................................................................. 138

XV.    PRAYER FOR RELIEF ............................................................................... 164

XVI.   JURY DEMAND .......................................................................................... 166

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

# I.    NATURE OF THE ACTION

1.    This suit brings claims on behalf of indirect purchasers ("End-Payers" or "Plaintiffs") of generic lidocaine 2.5% and prilocaine 2.5% topical cream ("Lidocaine-Prilocaine")[1] for injunctive relief and to recoup overcharges that resulted from an unlawful agreement among Defendants to allocate customers, rig bids, and fix, raise and/or stabilize the prices of generic Lidocaine-Prilocaine.

2.    Lidocaine-Prilocaine is a commonly prescribed topical anesthetic used to numb skin to pain from injections and other medical procedures. This drug works by blocking nerves from transmitting painful impulses to the brain. Branded lidocaine-prilocaine cream has been on the market for over 20 years, and generic versions have been available since at least 2003.

3.    For years, competition among sellers of Lidocaine-Prilocaine kept prices stable, at low levels. But starting on or around March 1, 2014, Defendants, who dominate the market for Lidocaine-Prilocaine, abruptly and inexplicably raised prices. For example, over the course of twelve months during the Class Period, the average market price for a 30 gram tube of generic Lidocaine-Prilocaine increased by approximately 145%.

4.    Defendants' unlawful and anticompetitive conduct in the Lidocaine-Prilocaine market is part of a larger conspiracy or series of conspiracies involving numerous generic pharmaceuticals and pharmaceutical manufacturers.

5.    The price increases imposed by Defendant manufacturers of generic Lidocaine-Prilocaine cannot be explained by supply shortages or any other market feature or shock.  Nor were they the result of unilateral business decisions.  Instead, the significant increases in the

---

[1] As used herein, the term "Lidocaine-Prilocaine" refers to the 30 gram tube of generic Lidocaine-Prilocaine topical cream.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

prices of generic Lidocaine-Prilocaine were the result of an illegal agreement among Defendants to fix prices.

6.     The market for generic Lidocaine-Prilocaine was highly conducive to collusion, as it was controlled almost exclusively by the Defendants and is subject to high barriers to entry, including substantial manufacturing costs and regulatory requirements. Because Lidocaine-Prilocaine is a medically necessary product for which reasonable substitutes are not available and demand is inelastic, Defendants were able to raise prices in concert without suffering corresponding losses in sales volume. Federal regulations require Defendants' Lidocaine-Prilocaine products to contain the same type and amount of active pharmaceutical ingredient and to be therapeutically equivalent to one another. They are therefore interchangeable commodity products. Interchangeability facilitates collusion, as cartel members can easily monitor and detect deviations from a price-fixing or market allocation agreement.

7.     Because purchasers choose whose Lidocaine-Prilocaine product to buy based primarily on price, and unilateral price increases generally result in loss of market share, it would have been economically irrational for any one Defendant to dramatically raise its prices without assurance that its competitors would do the same.

8.     Defendants' attendance at trade association meetings, conferences, and workshops provided ample opportunities to agree on generic Lidocaine-Prilocaine prices and allocate markets and customers for generic Lidocaine-Prilocaine. As alleged below, Defendants implemented their conspiracy through numerous secret meetings and communications, including trade association meetings held by the Generic Pharmaceutical Association ("GPhA") (now called the Association for Accessible Medicines), the National Association of Chain Drug Stores

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

("NACDS"), the Healthcare Distribution Management Association ("HDMA") (now called the Healthcare Distribution Alliance ("HDA")), and the Efficient Collaborative Retail Marketing ("ECRM"), among others.

9.      Extreme and unprecedented price increases in the generic drug industry—like those imposed by manufacturers of generic Lidocaine-Prilocaine —have prompted close scrutiny of the industry by the U.S. Congress, federal and state enforcement agencies, and private litigants.

10.      An ongoing criminal investigation by the Antitrust Division of the U.S. Department of Justice ("DOJ") has, to date, resulted in price-fixing guilty pleas from two senior executives at Heritage Pharmaceuticals, Inc. relating to the sale of generic Doxycycline Hyclate and Glyburide. But DOJ has made clear that its "investigation is ongoing"[2] and the evidence uncovered during the course of its investigation into those drugs also "implicates…a significant number of the Defendants…[and] a significant number of the drugs at issue" in this Multidistrict Litigation.[3]

11.      The Attorney General for the State of Connecticut ("Connecticut AG"), whose office has been pursuing an investigation of the generic drug industry parallel to that of DOJ, confirms that its price-fixing investigation extends "way beyond the two drugs and the six

---

[2] DOJ, Division Update Spring 2017 (Mar. 28, 2017), *available at* https://www.justice.gov/atr/division-operations/division-update-spring-2017/division-secures-individual-and-corporate-guilty-pleas-collusion-industries-where-products.

[3] Intervenor United States' Motion to Stay Discovery at 1-2 (May 1, 2017) (ECF No. 279).

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

companies. Way beyond… We're learning new things every day."[4] There is "compelling evidence of collusion and anticompetitive conduct across many companies that manufacture and market generic drugs in the United States . . . [and] evidence of widespread participation in illegal conspiracies across the generic drug industry."[5]

12.     Manufacturers of generic Lidocaine-Prilocaine are implicated in these ongoing investigations. As discussed below, at least two of the three Defendants named here—Impax Laboratories, Inc. and Sandoz Inc.—have received a federal grand jury subpoena and/or an investigative demand from the Connecticut AG as part of the generic drug price-fixing investigations.

13.     As End-Payers in the chain of pharmaceutical distribution, Plaintiffs bear the brunt of Defendants' illegal conduct. Plaintiffs have paid many millions of dollars more than they would have in a competitive market for generic Lidocaine-Prilocaine.

14.     Plaintiffs bring this action against Defendants on account of their past and ongoing violations of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3) and the state laws set forth below. Plaintiffs bring this action both individually and on behalf of (a) a national injunctive class of persons or entities in the United States and its territories who indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price of generic Lidocaine-Prilocaine (30 gm topical cream) manufactured by any Defendant, other than for

---

[4] *How Martinis, Steaks, and a Golf Round Raised Your Prescription Drug Prices*, Kaiser Health News (Dec. 21, 2016), *available at* http://www.thedailybeast.com/how-martinis-steaks-and-a-golf-round-raised-your-prescription-drug-prices.

[5] Connecticut AG, Press Release (Dec. 15, 2016), *available at* http://www.ct.gov/ag/cwp/view.asp?Q=588538&A=2341.

4

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

resale, from March 1, 2014 to the present ("Class Period"), and (b) a damages class of persons or entities in the states and territories identified herein who indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price of generic Lidocaine-Prilocaine (30 mg topical cream) manufactured by any Defendant, other than for resale, from March 1, 2014 to the present.

## II.    ONGOING FEDERAL AND STATE INVESTIGATIONS

15.    Now in its third year, the federal criminal investigation into generic drug price fixing has begun to bear fruit. On December 12 and 13, 2016, DOJ filed criminal charges against former Heritage executives Jeffrey Glazer (CEO) and Jason Malek (President). The government alleged that they conspired with others "to allocate customers, rig bids, and fix and maintain prices" of Glyburide and Doxycycline Hyclate in violation of the Sherman Act (15 U.S.C. § 1).[6]

16.    On January 9, 2017, Glazer and Malek pleaded guilty to those charges.[7] Deputy Assistant Attorney General Brent Snyder of the Justice Department's Antitrust Division explained: "These charges are an important step in correcting that injustice and in ensuring that generic pharmaceutical companies compete vigorously to provide these essential products at a price set by the market, not by collusion."[8] As they await sentencing, Glazer and Malek are

---

[6] Information ¶ 6, *United States v. Glazer*, No. 2:16-cr-00506-RBS (E.D. Pa. Dec. 12, 2016) (ECF No. 1); Information ¶ 6, *United States v. Malek*, No. 2:16-cr-00508-RBS (E.D. Pa. Dec. 13, 2016) (ECF No. 1).

[7] *See* Tr. of Plea Hearing, *United States v. Glazer*, No. 2:16-cr-00506-RBS (E.D. Pa. Jan. 9, 2017) (ECF No. 24); *see also* Tr. of Plea Hearing, *United States v. Malek*, No. 2:16-cr-00508-RBS (E.D. Pa. Jan. 9, 2017) (ECF No. 24).

[8] DOJ Press Release (Dec. 14, 2016) *available at* https://www.justice.gov/opa/pr/former-top-generic-pharmaceutical-executives-charged-price-fixing-bid-rigging-and-customer.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

cooperating with DOJ's continuing investigation. More criminal charges and guilty pleas are expected to follow.[9]

17.    Although initial public disclosures suggested that the federal and state investigations were focused on one or two drugs, it is now clear that both investigations are much, much broader. The investigations reportedly cover two dozen drugs and more than a dozen manufacturers.[10] Press reports indicate that "[t]he Department of Justice (DoJ) believes price-fixing between makers of generic pharmaceuticals is widespread."[11]

18.    According to one report, prosecutors see the investigation of the generic drug industry much like DOJ's antitrust probe of the auto parts industry, which has morphed into DOJ's largest criminal antitrust probe ever. *See In re Automotive Parts Antitrust Litig.*, No. 2:12-md-02311 (E.D. Mich.).  As in that case, prosecutors expect "to move from one drug to another in a similar cascading fashion."[12]

19.    The DOJ and a federal grand jury empaneled in the Eastern District of Pennsylvania have focused on at least seventeen generic drug manufacturers as part of the growing investigation, including: Actavis Holdco U.S., Inc. ("Actavis"); Aurobindo Pharma

---

[9] *See, e.g.,* Eric Kroh, *Generic Drug Price-Fixing Suits Just Tip Of The Iceberg*, Law360 (Jan. 6, 2017) ("'Once somebody starts cooperating, it leads to many more indictments.'"), *available at* https://www.law360.com/articles/877707/generic-drug-price-fixing-suits-just-tip-of-the-iceberg.

[10] David McLaughlin & Caroline Chen, *U.S. Charges in Generic-Drug Probe to Be Filed by Year-End*, Bloomberg (Nov. 3, 2016) *available at* http://www.bloomberg.com/news/articles/2016-11-03/u-s-charges-in-generic-drug-probe-said-to-be-filed-by-year-end.

[11] PaRR Report, *DoJ Believes Collusion over Generic Drug Prices Widespread* (June 26, 2015) ("PaRR Report"), *available at* http://www.mergermarket.com/pdf/DoJ-Collusion-Generic-Drug-Prices-2015.pdf.

[12] *Id.*

6

USA, Inc. ("Aurobindo"); Citron Pharma LLC ("Citron"); Dr. Reddy's Laboratories, Inc. ("Dr. Reddy's"); Heritage Pharmaceutical, Inc. ("Heritage"); Impax Laboratories, Inc. ("Impax"); Lannett Company, Inc. ("Lannett"); Mayne Pharma, Inc. ("Mayne"); Mylan Inc. ("Mylan"); Par Pharmaceuticals, Inc. ("Par"); Perrigo New York, Inc. ("Perrigo"); Sandoz, Inc. ("Sandoz"); Sun Pharmaceutical Industries, Inc. ("Sun"); Taro Pharmaceuticals USA, Inc. ("Taro"); Teva Pharmaceuticals USA, Inc. ("Teva"); and Zydus Pharmaceuticals USA, Inc. ("Zydus"). And as recently as August 10, 2017, Pfizer, Inc. ("Pfizer") also disclosed that DOJ is investigating its Greenstone generics business.[13]

20.     The fact that these companies and/or their employees received subpoenas from a federal grand jury is significant.  The DOJ does not empanel grand juries lightly. The *Antitrust Division Manual* admonishes that "staff should consider carefully the likelihood that, if a grand jury investigation developed evidence confirming the alleged anticompetitive conduct, the Division would proceed with a criminal prosecution." Accordingly, before a grand jury investigation proceeds, it requires a series of approvals, first by the relevant field chief, who then sends the request to the Antitrust Criminal Enforcement Division. "The DAAG [Deputy Assistant Attorney General] for Operations, the Criminal DAAG, and the Director of Criminal Enforcement will make a recommendation to the Assistant Attorney General[,]" who must give final approval and authorize all attorneys who will participate in the investigation.[14]

---

[13] Further discussion of these generic drug manufacturers and their receipt of subpoenas or other inquiries from DOJ is included *infra* at ¶ 170.

[14] DOJ, Antitrust Division Manual (5th ed. 2015) at Chapter III-81 to 83, *available at* http://www.justice.gov/atr/public/divisionmanual/chapter3.pdf.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

21.     As Mark Rosman, former assistant chief of the National Criminal Enforcement Section of DOJ's Antitrust Division, noted in an article on the "unusual" nature of the criminal subpoenas, "A DOJ investigation into the alleged exchange of pricing information in the pharmaceutical industry likely indicates that the agency anticipates uncovering criminal antitrust conduct in the form of price-fixing or customer allocation."[15]

22.     Another significant indication of criminal price fixing in the generic drug industry is that DOJ has received assistance from a privately-held company that came forward as a leniency applicant:   "It is understood that Heritage is cooperating with prosecutors in exchange for amnesty from criminal prosecution under DOJ's leniency program[.]"[16]   As explained on DOJ's website, an applicant for amnesty "must admit its participation in a criminal antitrust violation involving price fixing, bid rigging, capacity restriction, or allocation of markets, customers, or sales or production volumes, before it will receive a conditional leniency letter." The applicant must also establish that "[t]he confession of wrongdoing is truly a corporate act, as opposed to isolated confessions of individual executives or officials."[17]

23.     In addition to the federal criminal investigation, the Connecticut AG began an investigation in July 2014 into the dramatic price increases in generic drugs.  Now joined by the Attorneys General of 43 other states and the District of Columbia, the Connecticut AG has filed a civil complaint in the U.S. District Court for the District of Connecticut alleging price fixing

---

[15] Mark Rosman & Seth Silber, *DOJ's Investigation Into Generic Pharma Pricing Is Unusual,* Law360 (Nov. 12, 2014), *available at* https://www.wsgr.com/publications/PDFSearch/rosman-1114.pdf.

[16] Richard Vanderford, *Generic Pharma Investigation Still Broad, Prosecutor Says*, mLex (Feb. 21, 2017).

[17] DOJ, *Frequently Asked Questions about the Antitrust Division's Leniency Program* (updated Jan. 26, 2017), *available at* https://www.justice.gov/atr/page/file/926521/download

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

and customer allocation.[18]  Although the States' present complaint focuses on two drugs (Doxycycline Hyclate delayed release and Glyburide), the States make clear that they have "uncovered wide-ranging conduct implicating numerous different drugs and competitors" and suggest that additional drugs and manufacturers will be added "at the appropriate time."[19]

24.      The publicly available version of the State AG Complaint is heavily redacted. Among the obscured portions are the contents of conspiratorial communications, which the Connecticut AG has described as "mind-boggling."[20]  The State AG Complaint explains that the generic drug industry is structured in a way that facilitates these types of collusive communications.  "Generic drug manufacturers operate, through their respective senior leadership and marketing and sales executives, in a manner that fosters and promotes routine and direct interaction among their competitors."  This affords them opportunities to "exploit their interactions at various and frequent industry trade shows, customer conferences and other similar events, to develop relationships and sow the seeds for their illegal agreements."[21]

25.      The criminal informations and guilty pleas relating to Glazer and Malek, the grand jury subpoenas, and evidence divulged in the State AG Complaint are merely the tip of the iceberg.   The government investigations have uncovered the existence of "a broad, well-

---

[18] On August 3, 2017, the U.S. Judicial Panel on Multidistrict Litigation ("JPML") issued an order directing that the State AG case be transferred to this Court and coordinated as part of MDL 2724 (ECF No. 417).

[19] *State of Connecticut v. Aurobindo Pharma USA, Inc.*, No. 3:16-cv-2056 (VLB) (D. Conn.) (Doc. 168 at ¶ 9) (State AG Complaint), *available at* http://www.ct.gov/ag/lib/ag/press_releases/2016/20161215_gdms_complain.pdf.

[20] Mark Pazniokus, *How a small-state AG's office plays in the big leagues*, CT Mirror (Jan. 27, 2017), *available at* http://ctmirror.org/2017/01/27/how-a-small-state-ags-office-plays-in-the-big-leagues/.

[21] State AG Complaint ¶ 7.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

coordinated and long-running series of schemes to fix the prices and allocate markets for a number of generic pharmaceuticals in the United States."[22] Plaintiffs do not yet have access to all of the information available to the government enforcement agencies. What is known is that in light of all the evidence described above, the large and unprecedented price increases for generic Lidocaine-Prilocaine cannot be explained by normal, competitive market forces. The explanation is collusion.

### III.    JURISDICTION AND VENUE

26.    Plaintiffs bring Count One of this action under Section 16 of the Clayton Act (15 U.S.C. § 26) for injunctive relief and costs of suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiffs and the members of the Classes described herein by reason of the violations of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

27.    This action is also instituted under the antitrust, consumer protection, and common laws of various states and territories for damages and equitable relief, as described in Counts Two through Four below.

28.    Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1337 and by Section 16 of the Clayton Act (15 U.S.C. § 26). In addition, jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1332(d) and 1367.

29.    Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a) and 22 and 28 U.S.C §§ 1391(b), (c) and (d); and 1407 and MDL Order dated April 6, 2017 (ECF No. 291), and because, during the Class Period, Defendants resided, transacted business, were found, or had agents in this District, and a substantial portion of the affected interstate trade and commerce

---

[22] State AG Complaint ¶ 1.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

described below has been carried out in this District. Venue is also proper in this District because the federal grand jury investigating the pricing of generic drugs is empaneled here and therefore it is likely that acts in furtherance of the alleged conspiracy took place here. According to DOJ guidelines, an "investigation should be conducted by a grand jury in a judicial district where venue lies for the offense, such as a district from or to which price-fixed sales were made or where conspiratorial communications occurred."[23]

30.     This Court has personal jurisdiction over each Defendant because, *inter alia*, each Defendant: (a) transacted business throughout the United States, including in this District; (b) marketed and sold generic Lidocaine-Prilocaine throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; (d) was engaged in an illegal scheme and nationwide price-fixing conspiracy that was directed at, had the intended effect of causing injury to, and did cause injury to persons residing in, located in, or doing business throughout the United States, including in this District; and/or (e) took overt action in furtherance of the conspiracy in this District or conspired with someone who did, and by doing so could reasonably have expected to be sued in this District. In addition, nationwide personal jurisdiction was authorized by Congress pursuant to the Clayton Act and by 28 U.S.C. § 1407.

## IV.    <u>PLAINTIFFS</u>

31.     Plaintiffs 1199SEIU National Benefit Fund, 1199SEIU Greater New York Benefit Fund, 1199SEIU National Benefit Fund for Home Care Workers, and 1199SEIU Licensed Practical Nurses Welfare Fund are jointly administered health and welfare funds (collectively,

---

[23] DOJ, Antitrust Division Manual at III-83.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

"1199SEIU Benefit Funds"). The 1199SEIU Benefit Funds are among the largest labor-management funds in the nation, providing comprehensive health benefits to hundreds of thousands of working and retired healthcare industry workers and their families. They provide health and welfare benefits to 400,000 members, retirees, and their families, who reside in numerous locations in the United States. During the Class Period, the 1199SEIU Benefit Funds indirectly purchased and paid for some or all of the purchase price for one or more generic Lidocaine-Prilocaine prescriptions, other than for resale, manufactured by the Defendants. Plaintiffs made such payments and/or reimbursements in Arizona, California, Colorado, Connecticut, Florida, Georgia, Indiana, Kentucky, Louisiana, Maryland, Massachusetts, Minnesota, Missouri, New Jersey, New Mexico, New York, North Carolina, Pennsylvania, South Carolina, Tennessee, Texas, and Virginia, thereby suffering injury to its business and property. During the Class Period, the 1199SEIU Benefit Funds paid and reimbursed more for these products than they would have absent Defendants' anticompetitive conduct to fix, raise, maintain, and stabilize the prices and allocate markets and customers for those products. As a result of the alleged conspiracy, the 1199SEIU Benefit Funds were injured in their business or property by reason of the violations of law alleged herein. The 1199SEIU Benefit Funds intend to continue purchasing and/or reimbursing for these drugs and will continue to be injured unless the Defendants are enjoined from their unlawful conduct as alleged herein.

32. Plaintiff The City of Providence, Rhode Island ("Providence") is a municipal corporation. Its principal office is located in Providence, Rhode Island. Providence is a self-insured health and welfare benefit plan, and purchases, pays and/or provides reimbursement for its employees, retirees, and/or plan beneficiaries, who reside in numerous locations in the United

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

States, for some or all of the purchase price of prescription drugs. During the Class Period, Providence indirectly purchased, paid, and/or provided reimbursement for some or all of the purchase price for one or more generic Lidocaine-Prilocaine prescriptions, other than for resale, manufactured by the Defendants. Providence made such payments and/or reimbursements in Alabama, Arkansas, Florida, Massachusetts, Missouri, New Hampshire, Pennsylvania, Rhode Island, and South Carolina, thereby suffering injury to its business and property.  During the Class Period, Providence paid and/or reimbursed more for these products than it would have absent Defendants' anticompetitive conduct to fix, raise, maintain, and/or stabilize the prices and allocate markets and customers for those products. As a result of the alleged conspiracy, Providence was injured in its business or property by reason of the violations of law alleged herein. Providence intends to continue purchasing and/or reimbursing for these drugs and will continue to be injured unless the Defendants are enjoined from their unlawful conduct as alleged herein.

33.    Plaintiff Louisiana Health Service & Indemnity Company d/b/a Blue Cross and Blue Shield of Louisiana and HMO Louisiana, Inc. (collectively, "BCBS-LA") is headquartered in Baton Rouge, Louisiana, and is Louisiana's oldest and largest domestic health insurer, with over 1 million members.  During the Class Period, BCBS-LA indirectly purchased, paid, and/or provided reimbursement on behalf of its members for some or all of the purchase price for one or more generic Lidocaine-Prilocaine prescriptions, other than for resale, manufactured by the Defendants. Plaintiff made such payments and/or reimbursements in Alabama, Arizona, Arkansas, California, Colorado, Connecticut, Florida, Georgia, Idaho, Illinois, Indiana, Kansas, Kentucky, Louisiana, Maryland, Massachusetts, Michigan, Mississippi, Missouri, Montana,

13

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Nevada, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Pennsylvania, South Carolina, Tennessee, Texas, Virginia, Washington, West Virginia, Wisconsin, and Puerto Rico, thereby suffering injury to its business and property. During the Class Period, BCBS-LA paid and reimbursed more for these products than it would have absent Defendants' anticompetitive conduct to fix, raise, maintain, and stabilize the prices and allocate markets and customers for those products. As a result of the alleged conspiracy, BCBS-LA was injured in its business or property by reason of the violations of law alleged herein. BCBS-LA intends to continue purchasing and/or reimbursing for these drugs and will continue to be injured unless the Defendants are enjoined from their unlawful conduct as alleged herein.

34.     Plaintiff Philadelphia Federation of Teachers Health and Welfare Fund ("Philadelphia Teacher's Fund") is a voluntary employee benefits plan organized pursuant to §501(c) of the Internal Revenue Code to provide health benefits to its eligible participants and beneficiaries. Philadelphia Teacher's Fund maintains its principal place of business in Philadelphia, Pennsylvania. It provides health benefits, including prescription drug benefits, to approximately 34,000 beneficiaries and covered spouses and dependents.  During the Class Period Philadelphia Teacher's Fund indirectly purchased and paid for some or all of the purchase price for one or more generic Lidocaine-Prilocaine cream prescriptions, other than for resale, manufactured by the Defendants. Plaintiff made such payments and/or reimbursements in California, Delaware, Florida, Georgia, Kansas, Nevada, New Jersey, New York, and Pennsylvania. During the Class Period, Philadelphia Teacher's Fund purchased and paid more for these products than it would have absent Defendants' anticompetitive conduct to fix, raise, maintain, and stabilize the prices and allocate markets and customers for these products. As a

14

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

result of the alleged conspiracy, Philadelphia Teacher's Fund was injured in its business or property by reasons of the violations of law alleged herein. Philadelphia Teacher's Fund intends to continue purchasing and/or reimbursing for these drugs and will continue to be injured unless the Defendants are enjoined from their unlawful conduct as alleged herein.

35.     Plaintiff Self-Insured Schools of California ("SISC") is a Joint Powers Authority under California law that serves the interests of California public school district members. It is headquartered in Bakersfield, California. It provides health benefit plans to approximately 300,000 members who reside in numerous locations in the United States. During the Class Period, SISC indirectly purchased and paid for some or all of the purchase price for one or more generic Lidocaine-Prilocaine prescriptions, other than for resale, manufactured by the Defendants. SISC made such payments and/or reimbursements in Alabama, Arizona, California, Florida, Hawaii, Idaho, Louisiana, Michigan, Minnesota, Missouri, Montana, Nevada, New York, North Carolina, North Dakota, Oklahoma, Oregon, Pennsylvania, South Carolina, Tennessee, Texas, Utah, and Washington, thereby suffering injury to its business and property. During the Class Period, SISC paid and reimbursed more for these products more than it would have absent Defendants' anticompetitive conduct to fix, raise, maintain, and stabilize the prices and allocate markets and customers for those products. As a result of the alleged conspiracy, SISC was injured in its business or property by reason of the violations of law alleged herein. SISC intends to continue purchasing and/or reimbursing for these drugs and will continue to be injured unless the Defendants are enjoined from their unlawful conduct as alleged herein.

36.     Plaintiff Sergeants Benevolent Association of the Police Department of the City of New York Health and Welfare Fund (SBA Fund) is a citizen of the State of New York, and

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

has its principal place of business at 35 Worth Street, New York, New York. SBA Fund is an independent labor organization operating under Internal Revenue Code section 501(c)(5), and is sponsored and administered by a Board of Trustees. As such, SBA Fund is a legal entity entitled to bring suit in its own name.  SBA Fund is an "employee welfare benefit plan" and an "employee benefit plan" with membership of approximately 36,000 active and retired sergeants of the New York City Police Department and their dependents.  It provides health care benefits, including prescription drug benefits, to participants and their dependents. During the Class Period, SBA Fund indirectly purchased and paid for some or all of the purchase price for one or more generic Lidocaine-Prilocaine prescriptions, other than for resale, manufactured by the Defendants. SBA Fund made such payments and/or reimbursements in Connecticut, Delaware, Florida, Maryland, Nevada, New Hampshire, New Jersey, New York, North Carolina, Texas, and Utah.  During the Class Period, SBA Fund paid and reimbursed more for these products than it would have absent Defendants' anticompetitive conduct to fix, raise, maintain, and stabilize the prices and allocate markets and customers for these products. As a result of the alleged conspiracy, SBA Fund was injured in its business or property by reasons of the violations of law alleged herein. SBA Fund intends to continue paying and/or reimbursing for these drugs and will continue to be injured unless the Defendants are enjoined from their unlawful conduct as alleged herein.

37.    Plaintiff Unite Here Health ("UHH") is a multi-employer trust fund composed of union and employer representatives, whose mission is to provide health benefits that offer high quality, affordable healthcare to its participants at a better value and with a better service than is otherwise available in the market. Headquartered in Aurora, Illinois, UHH has served union

16

workers in the hospitality, food service, and gaming industries for the past several decades. During the Class Period, UHH indirectly purchased and paid for some or all of the purchase price for one or more generic Lidocaine and Prilocaine prescriptions, other than for resale, manufactured by the Defendants. Plaintiff made such payments and/or reimbursements in Alabama, California, Connecticut, Florida, Georgia, Illinois, Indiana, Louisiana, Massachusetts, Michigan, Missouri, Nevada, New Jersey, New York, Ohio, Pennsylvania, Tennessee, Texas, and Virginia.  During the Class Period, UHH purchased and paid more for these products than it would have absent Defendants' anticompetitive conduct to fix, raise, maintain, and stabilize the prices and allocate markets and customers for these products. As a result of the alleged conspiracy, Plaintiff UHH was injured in its business or property by reason of the violations of law alleged herein. UHH intends to continue purchasing and/or reimbursing for these drugs and will continue to be injured unless the Defendants are enjoined from their unlawful conduct as alleged herein.

## V.    **DEFENDANTS**

**Hi-Tech Defendants**

38.    Defendant Akorn Inc. is a Louisiana corporation with its principal place of business in Lake Forest, Illinois.  It is the parent company of Hi-Tech Pharmacal Co., Inc. and Akorn Sales, Inc.

39.    Defendant Akorn Sales, Inc. is a Delaware corporation.  It is a wholly owned subsidiary of Akorn Inc.  It is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania.

17

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

40.     Defendant Hi-Tech Pharmacal Co., Inc. is a Delaware corporation with its principal place of business in Amityville, New York. It is a wholly owned subsidiary of Akorn, Inc.  Akorn Inc. acquired and integrated Hi-Tech into its operations in April 2014.

41.     Unless addressed individually, Akorn Inc., Akorn Sales, Inc. and Hi-Tech are collectively referred to herein as "Hi-Tech."   During the Class Period, Hi-Tech sold generic Lidocaine-Prilocaine in this District and other locations in the United States.

**Impax**

42.     Defendant Impax Laboratories, Inc. ("Impax") is a Delaware corporation with its principal place of business in Hayward, California. Impax's generics division is called Global Pharmaceuticals (collectively referred to as "Impax"). Impax is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania. During the Class Period, Impax marketed and sold generic Lidocaine-Prilocaine to customers in this District and other locations in the United States.

**Sandoz Defendants**

43.     Defendant Sandoz Inc. is a Colorado corporation with its principal place of business in Princeton, New Jersey. Sandoz is a subsidiary of Novartis AG, a global pharmaceutical company based in Basel, Switzerland. Sandoz is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania.

44.     Defendant Fougera Pharmaceuticals Inc. ("Fougera") is a New York corporation with its principal place of business in Melville, New York. Fougera is a wholly owned subsidiary of Sandoz. In 2012, Sandoz acquired and integrated Fougera into its US-based generic pharmaceutical business.

18

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

45.     Unless addressed individually, Fougera and Sandoz, Inc. are collectively referred to herein as "Sandoz." During the Class Period, Sandoz marketed and sold generic Lidocaine-Prilocaine in this District and other locations in the United States.

## VI.     CO-CONSPIRATORS

46.     Various other persons, firms, corporations and entities have participated as co-conspirators with Defendants in the violations and conspiracy alleged herein. In order to engage in the violations alleged herein, these co-conspirators have performed acts and made statements in furtherance of the antitrust violations and conspiracies alleged herein. Plaintiffs may amend this Complaint to allege the names of additional co-conspirators as they are discovered.

## VII.     INTERSTATE AND INTRASTATE TRADE AND COMMERCE

47.     During the Class Period, Defendants sold and distributed generic Lidocaine-Prilocaine in a continuous and uninterrupted flow of interstate commerce to customers throughout the United States, including in this District.

48.     Defendants' and their co-conspirators' conduct, including the marketing and sale of generic Lidocaine-Prilocaine, took place within the United States and, has had, and was intended to have, a direct, substantial, and reasonably foreseeable anticompetitive effect upon interstate commerce within the United States.

49.     Defendants' anticompetitive conduct occurred in part in trade and commerce within the states and territories set forth herein, and also had substantial intrastate effects in that, *inter alia*, retailers within each state and territory were foreclosed from offering less expensive generic Lidocaine-Prilocaine to Plaintiffs inside each respective state and territory. The

19

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

foreclosure of these less expensive generic products directly impacted and disrupted commerce for Plaintiffs within each state and territory and forced Plaintiffs to pay supracompetitive prices.

## VIII.   BACKGROUND OF THE GENERIC DRUG INDUSTRY

### A.   Generic Drugs Are Commodity Products

50.   Approximately 88% of all pharmaceutical prescriptions in the United States are filled with a generic drug.[24] In 2015, generic drug sales in the United States were estimated at $74.5 billion.[25]

51.   According to the U.S. Food & Drug Administration ("FDA"), a generic drug is "the same as a brand name drug in dosage, safety, strength, how it is taken, quality, performance, and intended use."[26] Once the FDA approves a generic drug as "therapeutically equivalent" to a brand drug, the generic version "can be expected to have equal effect and no difference when substituted for the brand name product."[27]

52.   In a competitive market, generic drugs cost substantially less than branded drugs. The U.S. Congressional Budget Office ("CBO") estimates that, "[o]n average, the retail price of a generic drug is 75 percent lower than the retail price of a brand-name drug."[28]  And that may be conservative. According to a Federal Trade Commission ("FTC") study, in a "mature generic

---

[24] GPhA, *Generic Drug Savings in the U.S.* (2015) ("GPhA Report") at 1, *available at* http://www.gphaonline.org/media/wysiwyg/PDF/GPhA_Savings_Report_2015.pdf.

[25] Connecticut AG, Press Release (Dec. 15, 2016), *available at* http://www.ct.gov/ag/cwp/view.asp?Q=588538&A=2341.

[26] FDA Website, *available at* http://www.fda.gov/Drugs/InformationOnDrugs/ucm079436.htm#G.

[27] *Id.*

[28] CBO, *Effects of Using Generic Drugs on Medicare's Prescription Drug Spending* (Sep. 15, 2010), *available at* https://www.cbo.gov/publication/21800.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

market, generic prices are, on average, 85% lower than the pre-entry branded drug price."[29] Mature generic markets—like that of Lidocaine-Prilocaine—typically have several manufacturers that compete for sales, hence keeping prices in check.

53.     Generic drug price competition provides enormous savings to consumers, pharmacies, and other drug purchasers, as well as to private health insurers, health and welfare funds, and state Medicaid programs. Indeed, one study found that the use of generic medicines saved the United States healthcare system $254 billion in 2014 alone, and $1.68 trillion between 2005 and 2014.[30]

54.     The significant cost savings provided by generic drugs motivated Congress to enact the Drug Price Competition and Patent Term Restoration Act of 1984, more commonly known as the "Hatch-Waxman Act" (Pub. L. No. 98-417, 98 Stat. 1585). The Act streamlines the regulatory hurdles that generic drug manufacturers must clear prior to marketing and selling generic drugs. Generic drug manufacturers may obtain FDA approval in an expedited fashion through the filing of an Abbreviated New Drug Application ("ANDA") that establishes that its product is bioequivalent to the branded counterpart.

55.     Since passage of the Hatch-Waxman Act, every state has adopted substitution laws requiring or permitting pharmacies to substitute generic drug equivalents for branded drug prescriptions (unless the prescribing physician specifically orders otherwise by writing "dispense as written" or similar language on the prescription).

---

[29] FTC, *Pay-For-Delay: How Drug Company Pay-offs Cost Consumers Billions* (Jan. 2010), *available at* http://www.ftc.gov/os/2010/01/100112payfordelayrpt.pdf.

[30] GPhA Report at 1.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

56.    Because each generic is readily substitutable for another generic of the same brand drug, pricing is the main differentiating feature. As recognized by the FTC, "generic drugs are commodity products" and, as a consequence of that, are marketed "primarily on the basis of price."[31]  In a competitive market, generic manufacturers cannot significantly increase prices (or maintain high prices in the face of a competitor's lower price) without losing a significant volume of sales.

57.    It is well-established that competition among generic manufacturers drives down price.  Before generic drugs enter a market, the brand drug has a monopoly and captures 100% of sales. When lower-priced generics become available, the brand drug quickly loses market share as purchasers switch to the less expensive alternatives. Over time, the price of a generic drug approaches the manufacturers' marginal costs.  As illustrated in the following chart, the price of a generic drug tends to decrease as more generic drug manufacturers enter the market:



**Generic Competition and Drug Prices**

Source:  FDA analysis of retail sales data from IMS Health, IMS National Sales Perspective (TM), 1999-2004, extracted February 2005

---

[31] FTC, *Authorized Generic Drugs: Short-Term Effects and Long-Term Impact* (Aug. 2011), *available at* http://www.ftc.gov/os/2011/08/2011genericdrugreport.pdf.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

58.     When new entrants join a competitive generic market, they typically will price their product below the prevailing market price in order to gain market share. A recent government report confirmed this phenomenon in interviews with generic manufacturers: "manufacturers said that if a company is bringing a generic drug into an established drug market, it typically offers a price that is lower than the current market price in order to build its customer base. Manufacturers also said that as each new manufacturer enters an established generic drug market the price of that generic will fall, with one manufacturer noting that it is typically a 20 percent price decline per entrant." [32]

59.     When there are multiple generic manufacturers in an established generic market— as with generic Lidocaine-Prilocaine—prices should remain low and stable, and should not increase absent a market disruption or, as is the case here, anticompetitive conduct.

### B.     Pricing in the U.S. Prescription Drug Industry

60.     In simple terms, the generic pharmaceutical supply chain flows as follows: Manufacturers sell drugs to wholesalers. Wholesalers sell drugs to pharmacies. Pharmacies dispense the drugs to consumers, who pay the full retail price if they are uninsured, or a portion of the retail price (*e.g.*, a co-pay or co-insurance) if they are insured.  The insured consumers' health plans then pay the pharmacies additional amounts that are specified in agreements between them and the pharmacies.  These agreements are sometimes arranged by middlemen known as Pharmacy Benefit Managers ("PBMs").

61.     Because the prices paid by purchasers of generic drugs differ at different levels of the market and most of the transactions occur between private parties according to terms that are

---

[32] GAO Report at 23.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

not publicly disclosed, the price of a given drug is not always obvious. Market-wide pricing for a given drug, however, may be observed through the Centers for Medicare & Medicaid Services ("CMS") survey of National Average Drug Acquisition Cost ("NADAC"). NADAC was "designed to create a national benchmark that is reflective of the prices paid by retail community pharmacies to acquire prescription . . . drugs."[33]  "NADAC is a simple average of the drug acquisition costs submitted by retail community pharmacies."[34]  In effect, NADAC is "a single national average."[35]  Thus, NADAC is one way to track general price trends in the marketplace.

62.     While NADAC provides the average price level across all manufacturers of a given drug, other prices are manufacturer specific. Drug manufacturers typically report benchmarks—like Wholesale Acquisition Cost ("WAC")—for their drugs, which are then published in compendia used by participants in the pharmaceutical industry.  The benchmarks are not actual transaction prices; rather, they are the manufacturer's reported list price.  Accordingly, WAC prices do not take into account discounts that may be provided, *e.g.*, for volume sales.[36]

---

[33] CMS, Methodology for Calculating the National Average Drug Acquisition Cost (NADAC) for Medicaid Covered Outpatient Drugs at 5, *available at* https://www.medicaid.gov/medicaid-chip-program-information/by-topics/prescription-drugs/ful-nadac-downloads/nadacmethodology.pdf.

[34] *Id.* at 15.

[35] *Id.*

[36] Average Wholesale Price ("AWP") is another benchmark price that is used in the pharmaceutical industry.  And QuintilesIMS's National Sales Perspectives ("NSP") is another measure of manufacturer specific pricing. NSP data "captures 100% of the total U.S. pharmaceutical market, measuring sales at actual transaction prices rather than using an average wholesale price" and includes sales by manufacturers into various outlets.  IMS Institute for Healthcare Informatics, HSRN Data Brief: National Sales Perspectives at 1, *available at* https://www.imshealth.com/files/web/IMSH%20Institute/NSP_Data_Brief-.pdf.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

63.     The amount that an end-payer will pay a pharmacy for a generic drug typically is determined with reference to a benchmark or list price like a WAC. The end-payer pays the pharmacy an amount based on the manufacturer's list price for the drug, plus a small mark-up or dispensing fee.  Over time, third-party payers and PBMs have learned that manufacturers' list prices for some generic drugs can be substantially higher than the actual costs incurred by certain pharmacies to acquire the drugs.  As a consequence, end-payers were paying more than simply the acquisition cost plus a small amount.

64.     To combat this, some third-party payers and PBMs have implemented their own proprietary benchmark prices—Maximum Allowable Costs ("MACs")—that set the amounts they will pay pharmacies for some generic drugs.  A MAC caps the amount that an end-payer will pay a pharmacy for a given strength and dosage of a generic drug, regardless of the pharmacy's acquisition costs.

65.     Third-party payers and PBMs set the MAC of a drug based on several factors, one of which is believed to be the lowest acquisition cost in the market for that generic drug.  So, for example, if there are three manufacturers offering the same generic drug at three different prices, a PBM or third-party payer might set the MAC price at or near the lowest of the three prices.  A pharmacy could elect to buy from a manufacturer with a higher price, but upon resale to a customer of the PBM or third-party payer, the pharmacy would only be paid the MAC price.

66.     Drug purchasers always should have an incentive to buy the least expensive available drug.  Because MAC prices further incentivize pharmacies to choose the lowest priced option, a generic manufacturer that increases its price for a drug should expect to lose sales to a competitor with a lower price. Consequently, in the absence of coordinated pricing activity

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

among generic manufacturers, an individual manufacturer should not be able to significantly increase its price (or maintain a higher price in the face of a significantly lower competitor price) without incurring the loss of a significant volume of sales. A manufacturer can only raise its price if it knows its competitors will raise their prices, too, *i.e.*, if they are conspiring.

## IX.     THE GENERIC LIDOCAINE-PRILOCAINE CONSPIRACY

### A.     Congressional Responses to Generic Drug Price Increases

67.     In addition to the investigations by DOJ and the Connecticut AG, Congress has raised concerns about the alarming price spikes for numerous generic pharmaceuticals. These concerns were prompted by the very real hardship suffered by end-payers as a result of the unprecedented price increases.

68.     In the fall of 2014, Senator Bernie Sanders and Representative Elijah Cummings requested information from manufacturers of 10 drugs that had experienced extraordinary price increases. Six of those drugs are now the subject of complaints in this MDL.[37] The two sent letters to various generic drug manufacturers, including Defendant Impax (via its generics division, Global), asking about these price increases. In November 2014, Senator Sanders conducted a hearing entitled, "Why Are Some Generic Drugs Skyrocketing in Price?" ("Senate Hearing"). Various witnesses discussed the price hikes for generic drugs, but none of the industry executives that were invited to testify appeared.[38]

---

[37] Sen. Sanders, Press Release, *Congress Investigating Why Generic Drug Prices Are Skyrocketing* (Oct. 2, 2014), *available at* https://www.sanders.senate.gov/newsroom/press-releases/congress-investigating-why-generic-drug-prices-are-skyrocketing.

[38] Senate Hearing (Nov. 20, 2014), *available at* https://www.help.senate.gov/hearings/why-are-some-generic-drugs-skyrocketing-in-priced.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

69.     Senator Sanders and Representative Cummings followed up with a request to the Office of the Inspector General of the Department of Health & Human Services ("OIG"), asking it to investigate the effect that price increases of generic drugs have had on the Medicare and Medicaid programs.   The OIG issued its report in December 2015, confirming that price increases for numerous generic drugs far out-stripped inflation.[39]

70.     In response to another Congressional request—this one from Senators Susan Collins, Claire McCaskill, Bill Nelson and Mark Warner—the United States Government Accountability Office ("GAO") issued a report in August 2016 entitled "Generic Drugs Under Medicare: Part D Generic Drug Prices Declined Overall, but Some Had Extraordinary Price Increases."[40]  The GAO investigation confirmed that in a competitive market, generic drug prices decline and remain stable, absent shortages or other market disruptions.[41]  And this was the case for most generics. But it identified numerous drugs that experienced "extraordinary" increases, which it defined as an increase of more than 100%.[42]

### B.     The Generic Lidocaine-Prilocaine Market

71.     Lidocaine-Prilocaine is sold throughout the United States and its territories.

72.     At all relevant times, Defendants had substantial market power with respect to generic Lidocaine-Prilocaine. Defendants exercised this power to maintain supracompetitive

---

[39] HHS OIG, *Average Manufacturer Prices Increased Faster than Inflation for Many Generic Drugs* (Dec. 2015), *available at* https://oig.hhs.gov/oas/reports/region6/61500030.pdf.

[40] GAO Report.

[41] *Id.* at 23-25.

[42] *Id.* at 1 & Appendix III.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

prices for Lidocaine-Prilocaine without losing so many sales as to make the elevated price unprofitable.

73.     Defendants sold generic Lidocaine-Prilocaine at prices in excess of marginal costs, in excess of a competitive price, and enjoyed high profit margins.

74.     During the Class Period, Defendants dominated the Lidocaine-Prilocaine market with about a ▮▮▮ market share. Similarly, before the Class Period, from March 2011 through February 2014, the Defendants controlled nearly ▮▮▮▮ of the generic Lidocaine-Prilocaine market in the United States, implying a substantial amount of market power. The following pie graph shows a snapshot of the generic Lidocaine-Prilocaine market in June of 2014:



Source: IMS Health

75.     In fact, the Federal Trade Commission ("FTC") has specifically asserted in recent years that the market for Lidocaine-Prilocaine is highly concentrated and subject to

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

anticompetitive conduct. The HHI—or Herfindahl-Hirschman Index—is "a commonly accepted measure of market concentration." The FTC and the Department of Justice "generally consider markets in which the HHI is between 1,500 and 2,500 points to be moderately concentrated, and consider markets in which the HHI is in excess of 2,500 points to be highly concentrated."[43]

76.     In July 2012, the FTC filed a complaint against Defendant Sandoz's parent, Novartis AG, seeking to enjoin Novartis AG's acquisition of Defendant Fougera. The FTC specifically alleged that the acquisition would create antitrust concerns in the market for "generic Lidocaine-Prilocaine cream." According to the FTC, "Lidocaine-Prilocaine is available in . . . 30 gram tubes …. [t]he 30 gram tubes are prescribed directly to patients for home use. Fougera, Hi-Tech, and Novartis are the only U.S. suppliers of 30 gram tubes, with market shares of approximately 50 percent, 47 percent, and 3 percent, respectively. The Acquisition would increase the Herfindahl-Hirschman Index concentration in that market by 300 points to 5,018 points, and leave Hi-Tech as the only competitor to the combined Novartis/Fougera."[44] The FTC settled with Novartis AG by, in part, requiring Novartis to terminate its marketing agreement with Tolmar on Lidocaine-Prilocaine.[45]

77.     Defendant Impax and Defendant Akorn entered the generic Lidocaine-Prilocaine market in late 2012.

---

[43] DOJ website, HHI Definition, *available at* https://www.justice.gov/atr/herfindahl-hirschman-index.

[44] FTC Complaint, *In the Matter of Novartis AG* (July 13, 2012) *available at* https://www.ftc.gov/sites/default/files/documents/cases/2012/07/120716novartiscmpt.pdf.

[45] FTC, Press Release (July 16, 2012), *available at* https://www.ftc.gov/news-events/press-releases/2012/07/ftc-puts-conditions-novartis-ags-acquisition-fougera-holdings-inc.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

78.     In 2014, the FTC sought to enjoin Akorn's acquisition of Hi-Tech and filed an administrative complaint alleging that the acquisition would have anticompetitive effects. In that complaint, the FTC specifically alleged that the acquisition would cause the number of competitors of "generic topical cream containing 2.5% Lidocaine with Prilocaine," which the FTC defined as generic EMLA cream, to drop from 4 to 3, "would increase the HHI by 1488, from 4481 to a post-merger total of 5969, and would create a merged entity having a market share in excess of 74%."[46] The FTC alleged that Akorn had a market share of 12% and that Hi-Tech had a market share of 62%. After filing its administrative complaint, the FTC settled the matter by requiring the divestiture of portions of the Akorn/Hi-Tech Lidocaine-Prilocaine business to Watson Pharmaceuticals, Inc., which is now known as Actavis Holdco U.S., Inc. ("Actavis"). In conjunction with the divestiture, on April 17, 2014, Akorn and Actavis entered into a supply agreement under which Akorn would supply Lidocaine-Prilocaine cream to Actavis for a transitional period of either two years or until an alternative supplier is found.[47]

79.     Akorn's settlement resolved the FTC action in April 2014 after it agreed to divest a part of its Lidocaine-Prilocaine business to Actavis.[48] Despite its assurances to the FTC,

---

[46] FTC Complaint, *In the Matter of Akorn Inc. and Hi-Tech Pharmacal Co. Inc.* (April 11, 2014) *available at* https://www.ftc.gov/system/files/documents/cases/140414akorntechcmpt.pdf.

[47] Actavis plc, SEC 2014 Form 10-K, *available at* https://www.sec.gov/Archives/edgar/data/1578845/000119312515052898/d842874d10k.htm.

[48] FTC, Analysis of Consent Order, *available at* https://www.ftc.gov/system/files/documents/cases/140414akorntechanalysis.pdf. According to the IMS data, Actavis entered the generic Lidocaine-Prilocaine market in ▓▓▓▓▓▓▓ Teva Pharmaceutical Industries Ltd. ("Teva") then acquired Actavis Generics in August of 2016. *See* http://www.tevapharm.com/news/teva_completes_acquisition_of_actavis_generics_08_16.aspx.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Defendants used their market dominance to undermine competition and facilitate a price-fixing conspiracy that caused Plaintiffs to pay supracompetitive prices for generic Lidocaine-Prilocaine.

**C.     Generic Lidocaine-Prilocaine Price Increases**

80.     Until around March of 2014, generic Lidocaine-Prilocaine pricing was fairly stable. That stability is reflected in the following chart displaying NADAC data for generic Lidocaine-Prilocaine covering the years 2012 to 2015:



81.     Beginning on or around March of 2014 however—and without any explanation— the price of Defendants' generic Lidocaine-Prilocaine began to skyrocket. As shown in the NADAC chart above, the average price per unit of generic Lidocaine-Prilocaine sold across all Defendants was $0.49 in January of 2014, compared to $1.20 in January of 2015, a 145% increase.

31

82.     The sustained price elevation reflected in the NADAC chart was the result of a conspiracy among Defendants to artificially raise, fix, maintain, and/or stabilize the price of generic Lidocaine-Prilocaine sold in the United States.

83.     According to IMS National Sales Perspectives ("NSP") data,[49] Sandoz ████

████████████████████████████████████████████████████████████████

████████████████████████████████████

---

[49] IMS Health's NSP data is a measure of manufacturer specific pricing. IMS NSP data "captures 100% of the total U.S. pharmaceutical market, measuring sales at actual transaction prices[.]" IMS Institute for Healthcare Informatics, HSRN Data Brief: National Sales Perspectives at 1, *available at* https://www.imshealth.com/files/web/IMSH%20Institute/NSP_Data_Brief-.pdf.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



84.   **Sandoz:** For the three years before the Class Period began, the average effective

price per unit of its 30 gm generic Lidocaine-Prilocaine product was ███ [50]

85.   ████████████████████████████████████

████████████████████

---

[50] Plaintiffs calculate Defendants' effective prices based on IMS NSP data. Effective prices are calculated to multiple decimals.  For ease of reference, prices in this complaint are rounded to the nearest cent.  However, percentage increases are calculated based on the more precisely calculated price.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

| Product | Price Feb. 2014 | Hike Date | Hike Price | Percentage Increase |
|---|---|---|---|---|
| Lidocaine 2.5% and Prilocaine 2.5% Cream, 30 Grams | $ ███ | ██████ | ████ | ███ |

86.   █████████████████████████████████████████

███████████████████████████████

| Product | Price Date | Peak Price | Percentage Increase |
|---|---|---|---|
| Lidocaine 2.5% and Prilocaine 2.5% Cream, 30 Grams | █████ | ████ | █████ |

87.   █████████████████████████████████████████

██████████████████████████████   ██████████████

███████████████████

| Product | Price Feb. 2014 | Price Feb. 2017 | Percentage Increase |
|---|---|---|---|
| Lidocaine 2.5% and Prilocaine 2.5% Cream, 30 Grams | ████ | ████ | ████ |

88.   **Impax**: From the time it entered the market in November 2012 until February 2014, the average effective price per unit of its 30 gm generic Lidocaine-Prilocaine product was

████

89.   █████████████████████████████████████████

████████████████████████████

| Product | Price Feb. 2014 | Hike Date | Hike Price | Percentage Increase |
|---|---|---|---|---|
| Lidocaine 2.5% and Prilocaine 2.5% Cream, 30 Grams | ████ | ██████ | ████ | ████ |

34

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

90.   ████████████████████████████████████████████

████████████████████████████████████

| Product | Price Date | Peak Price | Percentage Increase |
|---|---|---|---|
| Lidocaine 2.5% and Prilocaine 2.5% Cream, 30 Grams | ██████████ | ██████ | ██████ |

91.   Impax maintained supracompetitive prices until late in the Class Period.

92.   **Akorn**: From the time it entered the market in December 2012 until February 2014, the average effective price per unit of its 30 gm generic Lidocaine-Prilocaine product was

██████

93.   ████████████████████████████████████████████

██████████████████████████

| Product | Price Feb. 2014 | Hike Date | Hike Price | Percentage Increase |
|---|---|---|---|---|
| Lidocaine 2.5% and Prilocaine 2.5% Cream, 30 Grams | ██████ | ██████████ | ██████ | ██████ |

94.   ████████████████████████████████████████████

████████████████████████████████████

| Product | Price Date | Peak Price | Percentage Increase |
|---|---|---|---|
| Lidocaine 2.5% and Prilocaine 2.5% Cream, 30 Grams | ██████████ | ██████ | ██████ |

95.   ████████████████████████████████████████████

████████████████████████████   ████████████████████

████████████████████████████

35

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

| Product | Price Feb. 2014 | Price Feb. 2017 | Percentage Increase |
|---|---|---|---|
| Lidocaine 2.5% and Prilocaine 2.5% Cream, 30 Grams | ■■■■ | ■■■■ | ■■■■ |

96.   **Hi-Tech**: For almost three years before the Class Period began, the average

effective price per unit of its 30 gm generic Lidocaine-Prilocaine product was■■■■

97.   ■■■■■■■■■■■■■■■■   ■■■■■■■■■■■■■

■■■■■■■■■■■■■■

| Product | Price Feb. 2014 | Hike Date | Hike Price | Percentage Increase |
|---|---|---|---|---|
| Lidocaine 2.5% and Prilocaine 2.5% Cream, 30 Grams | ■■■ | ■■■ | ■■■ | ■■■ |

98.   ■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■

| Product | Price Date | Peak Price | Percentage Increase |
|---|---|---|---|
| Lidocaine 2.5% and Prilocaine 2.5% Cream, 30 Grams | ■■■■ | ■■■ | ■■■ |

99.   Hi-Tech maintained supracompetitive prices until late in the Class Period.

100.   There are no reasonable justifications for this abrupt and dramatic increase in

prices.

101.   These extraordinary price increases were not the result of supply shortages,

demand spikes, or other competitive market conditions. There were no relevant labelling changes

or reported drug shortages that might have led to price increases. Nor was there a spike in

demand that could explain the price hikes.

36

102.    Federal law requires that drug manufacturers report drug shortages.[51] Lidocaine-Prilocaine is not listed on the FDA's list of Current and Resolved Drug Shortages and Discontinuations Reported to FDA. Similarly, the American Society of Health-System Pharmacists collects and reports drug supply shortages. Lidocaine-Prilocaine cream does not appear on either its current or resolved shortages lists.[52] None of the Defendants reported any drug shortages or supply disruptions to the FDA in explanation for the supracompetetive pricing of generic Lidocaine-Prilocaine.

103.    And because generic pharmaceutical manufacturers do not need to incur the large research and development costs that brand manufacturers absorb in developing new drugs, the price increases cannot be attributed to the need to fund research and development. Indeed, generic versions of Lidocaine-Prilocaine has been available in the market for *over 10 years* at the time of the 2014 price spikes.

104.    These Lidocaine-Prilocaine price hikes have caused extreme hardship to end-payers, including Plaintiffs. As noted in letters sent to generic drug manufacturers as part of a Congressional investigation into unexplained price increases:

> This dramatic increase in generic drug prices results in decreased access for patients. According to the National Community Pharmacists Association (NCPA), a 2013 member survey found that pharmacists across the country "have seen huge upswings in generic drug prices that are hurting patients and pharmacies ability to operate," and "77% of pharmacists reported 26 or more instances over the past six months of a large upswing in a generic drug's acquisition price." These price increases have a direct impact on patients' ability to purchase their needed medications. The NCPA survey found that "pharmacists

---

[51] FDA Safety and Innovation Act of 2012, Pub. L. No. 112-144, §§ 1001-1008, 126 STAT. 995, 1099-1108.

[52] *See also, Drug Information Updates* published on a monthly basis by PerformRx, available at http://www.performrx.com/providers/drug-information-updates.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

reported patients declining their medication due to increased co-pays," and "84% of pharmacists said that the acquisition price/lagging reimbursement trend is having a 'very significant' impact on their ability to remain in business to continue serving patients." (Footnotes omitted).[53]

105.    As previously discussed, the overcharges resulting from Defendants' conduct are directly traceable through the pharmaceutical distribution chain to End-Payers. *See* Section VIII(B).

106.    Defendants' price increases for Lidocaine-Prilocaine resulted in corresponding increases to the prices paid by Plaintiffs and members of the proposed Classes.

107.    Defendants were aware of and praised the lack of generic drug price competition and resulting higher prices. For example, during Akorn's August 5, 2014 earnings call, Akorn CEO Raj Rai stated, "we are seeing lot of price increases that are happening in the generic space and it affect some of our products as well. ***So, I would say overall, there is a healthier pricing environment than it was there, I would say six to eight months ago***." (emphasis added). Just a few months later, on November 6, 2014 – around the time Akorn's Lidocaine-Prilocaine prices ███████████████████████████████ – Raj  again praised the "healthy environment" for pricing in generic markets.

### D.    Defendants' Conspiracy[54]

108.    During the Class Period, Defendants conspired, combined, and contracted to fix, maintain, and stabilize prices, rig bids, and engage in market and customer allocation concerning

---

[53] The letters sent to generic drug manufacturers may be found at http://www.sanders.senate.gov/newsroom/press-releases/congress-investigating-why-generic-drug-prices-are-skyrocketing.

[54] The allegations included in this section pertaining to the HDMA, NACDS, and ECRM are based in part upon documents produced to plaintiffs pursuant to subpoenas *duces tecum* issued in *In re: Propranolol Antitrust Litigation*, No. 16-cv-9901 (S.D.N.Y.).

38

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Lidocaine-Prilocaine, which had the intended and actual effect of causing Plaintiffs and the other members of the proposed Class to pay artificially inflated prices above prices that would exist if a competitive market had determined prices for Lidocaine-Prilocaine.

109.   Beginning in March 2014, Defendants collectively caused the price of Lidocaine-Prilocaine to increase dramatically. Defendants' conduct cannot be explained by normal competitive forces. It was the result of an agreement among Defendants to increase pricing and restrain competition for the sale of generic Lidocaine-Prilocaine in the United States.   The agreement was furthered by discussions held at meetings and industry events hosted by the GPhA, HDMA, NACDS, and ECRM as well as other meetings and communications.

110.   To sustain a conspiracy, conspirators often communicate to ensure that all are adhering to the collective scheme. Here, such communications occurred primarily through (1) trade association meetings and conferences, (2) private meetings, dinners, and outings among smaller groups of employees of various generic drug manufacturers, and (3) individual private communications between and among Defendants' employees through use of the phone, electronic messaging and similar means.

111.   These secret, conspiratorial meetings, discussions, and communications helped to ensure that all Defendants agreed to participate in, implement, and maintain an unlawful bid rigging, price fixing, and market and customer allocation scheme.

112.   The industry intelligence-gathering reporting firm *Policy and Regulatory Report* has reportedly obtained information regarding the investigation of generic drug companies by DOJ, and has indicated that DOJ is investigating the extent to which trade associations and industry conferences have been used as forums for collusion among competing generic drug

39

companies.[55]   The State AGs have similarly noted the centrality of trade associations and industry conferences in their investigation, stating that they have uncovered evidence that certain generic drug companies "routinely coordinated their schemes through direct interaction with their competitors at industry trade shows, customer conferences, and other events, as well as through direct email, phone, and text message communications." [56]

113.    Defendants were members of numerous trade associations, which they used to facilitate their conspiratorial communications and implement their anticompetitive scheme to raise, maintain, and stabilize the prices of Lidocaine-Prilocaine, rig bids, and engage in market and customer allocation concerning Lidocaine-Prilocaine, including, but not limited to, GPhA, the NACDS, and HDMA. ███████████████████████

███████████

114.    The GPhA (now called the Association for Accessible Medicines) is the "leading trade association for manufacturers and distributors of prescription drugs."[57]  GPhA was formed in 2000 from the merger of three industry trade associations: the Generic Pharmaceutical Industry Association, the National Association of Pharmaceutical Manufacturers, and the National Pharmaceutical Alliance.

115.    GPhA's website touts, "[b]y becoming part of GPhA, you can participate in shaping the policies that govern the generic industry" and lists its "valuable membership

---

[55] Eric Palmer, *Actavis gets subpoena as DOJ probe of generic pricing moves up food chain*, FIERCEPHARMA (Aug. 7, 2015), *available at* http://www.fiercepharma.com/story/actavis-gets-subpoena-doj-probe-generic-pricing-moves-food-chain/2015-08-07.

[56] Connecticut AG, Press Release (Mar. 1, 2017), *available at* http://www.ct.gov/ag/cwp/view.asp?Q=590616&A=2341.

[57] GPhA, Membership, *available at* http://web.archive.org/web/20150413013008/http://www.gphaonline.org:80/about/membership ).

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

services, such as business networking opportunities, educational forums, access to lawmakers and regulators, and peer-to-peer connections."[58]   GPhA's "member companies supply approximately 90 percent of the generic prescription drugs dispensed in the U.S. each year."

116.   Defendants Impax and Sandoz were regular members of the GPhA during the Class Period.   Regular members "are corporations, partnerships or other legal entities whose primary U.S. business derives the majority of its revenues from sales of (1) finished dose drugs approved via ANDAs; (2) products sold as authorized generic drugs; (3) biosimilar/biogeneric products; or (4) DESI products."[59]

117.   Several of Defendants high-ranking corporate officers have served on GPhA's Board of Directors before and during the Class Period:

a.   **2012 Board of Directors**: David Klaum, Sr. VP & GM, Fougera; Carol Ben-Maimon, President, Impax Global Pharmaceuticals; and Don DeGolyer, President and CEO, Sandoz;

b.   **2013 Board of Directors**: Carol Ben-Maimon, President, Impax Global Pharmaceuticals; and Don DeGolyer, President and CEO, Sandoz;

c.   **2014 Board of Directors**: Carol Ben-Maimon, President, Impax Global Pharmaceuticals; Peter Goldschmidt, President of Sandoz US;

d.   **2015 Board of Directors**: Marcy McDonald, VP Regulatory Affairs of Impax; Peter Goldschmidt, President of Sandoz US; and

---

[58] *Id.*

[59] *Id.*

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

e.    **2016 Board of Directors**: Marcy McDonald, VP Regulatory Affairs of Impax; and Peter Goldschmidt, President of Sandoz US.

118.    In addition, former Heritage CEO, Jeffrey Glazer, who pleaded guilty to federal criminal charges relating to price fixing and other anticompetitive activity concerning generic drugs, also served on GPhA's Board of Directors.

119.    The NACDS is a national trade association representing chain community pharmacies. Its members include generic drug manufacturers, wholesalers, and retail chain pharmacies. NACDS holds regular industry events, including annual and regional conferences, which Defendants and other generic drug manufacturers attended, including the annual Total Store Expo.

120.    The HDMA (now the HDA) is a national trade association that represents "primary pharmaceutical distributors" which links the nation's drug manufacturers and more than 200,000 pharmacies, hospitals, long-term care facilities, and clinics.[60] HDMA holds regular conferences where its members, including generic drug manufacturers, meet to discuss various issues affecting the pharmaceutical industry. HDMA members during the Class Period have included Defendants Impax and Sandoz.

121.    According to its website, ECRM conducts Efficient Program Planning Sessions that are made up of one-on-one strategic meetings that connect decision makers in an effort to maximize time, grow sales, and uncover industry trends.

---

[60] HDA website, About, *available at* https://www.healthcaredistribution.org/about.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

122.    At annual meetings organized by ECRM, generic drug manufacturers have scheduled meetings with generic drug buyers at chain drug stores, supermarkets, mass merchants, wholesalers, distributors, and buy groups for independents.

123.    ███████████████████████████████████████████

████████████████████████

124.    As further set forth below, meetings and events hosted by the GPhA, HDMA, NACDS, and ECRM were frequently held during the Class Period and attended by high-level representatives from each Defendant, including employees with price-setting authority.

125.    For example, on October 1-3, 2012, GPhA held a meeting in Bethesda, Maryland that was attended by representatives of at least Defendants Fougera, Impax, and Sandoz.

126.    On February 20-22, 2013, GPhA held its Annual Meeting in Orlando, Florida that was attended by at least Defendants Akorn, Impax, and Sandoz.

127.    ███████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████

    ██    ███████████████████████████████████████

        █████████████████████████████████████████

    ██    ███████████████████████████████████████

        █████████████████████████████████████████

        ██████████

43

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

c. ███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████

128.    On June 4-5, 2013, GPhA held a meeting in Bethesda, Maryland that was attended by at least Defendants Fougera, Hi-Tech, Impax, and Sandoz.

129.    On June 2-5, 2013, HDMA held its 2013 Business Leadership Conference "BLC" in Orlando, Florida. HDMA's June 2013 BLC was attended by at least the following representatives from Defendants, who were key executives for generic drug sales and pricing:

a.    **Akorn:** Mark Dudick, Senior Director, National Accounts;

b.    **Impax**: Danny Darnell, Sr. National Account Manager; Gary Skalski, Director of Sales; Michael Grigsby, Sr. National Accounts Manager; Todd Engle, Sr. Director Sales Operations; William Ball, Sr. National Accounts Manager; and

c.    **Sandoz**: Alan Ryan, Associate Director, National Accounts; Dawn Doggett, National Trade Affairs Account Executive.

130.    On August 10-13, 2013, NACDS held its 2013 Total Store Expo at the Sands Expo Convention Center in Las Vegas, Nevada. NACDS's August 2013 Total Store Expo was attended by representatives from all Defendants, including at least the following key executives for generic drug sales and pricing:

a.    **Akorn:** M. Tranter, National Accounts Manager, Sales & Marketing; John Sabat, Senior VP, National Accounts; Mick McCanna, Account Manager;

b.    **Hi-Tech**: Ed Berrios, VP Sales & Marketing; Michael Corley, VP, National Accounts; Thomas Kronovich, VP National Accounts;

44

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

c.   **Impax**: Chris Gerber, Director of Pricing and Contracts; Italo Pennella, Trade Account Manager; Dan Rozmiarek, Trade Account Manager; and

d.   **Sandoz**: Peter Goldschmidt, President, Sandoz USA and Head, NA; Steven Greenstein, Director, Key Customers; Anuj Hasija, Executive Director, Key Customers; Armando Kellum, VP Sales & Marketing; Paul Krauthauser, SVP, Sales & Marketing; Della Lubke, National Account Executive.

131.   On October 28-30, 2013, GPhA held a meeting in Bethesda, Maryland that was attended by representatives from all Defendants, including Akorn, Fougera, Hi-Tech, Impax, and Sandoz.

132.   On February 28-30, 2013, GPhA held its Annual Meeting in Orlando, Florida that was attended by representatives from at least Defendants Hi-Tech, Impax, and Sandoz.

133.   ████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████

■   ██████████████████████████████

     ████████████████████████████

■   ██████████████████████████████

     ██████████████████████

■   ████████████████████████████████

     ██ ██ ██ ██ ██ ██ ██ ██ ██ ██

     ██████████████████████████████

45

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

134.    On June 1-4, 2014, the HDMA held a Business Leadership Conference ("BLC") at the JW Marriott Desert Ridge in Phoenix, Arizona.  The June 1-4, 2014 BLC was attended by the following representatives from all Defendants, including at least the following key executives for generic drug sales and pricing:

a.    **Akorn:** Jonathan Kafer, Senior Director, Channel Management;

b.    **Sandoz:** Lisa Badura, Director National Accounts – Sales; Anuj Hasija, Key Account Executive Director; Kirko Kirkov, Executive Director, Key Accounts; Ryan Alan, Associate Director, National Accounts; Sean Walsh, Key Account Manager; Della Lubke, Director, National Accounts, Sales; David Picard, VP Generic Sales; Christopher Bihari, Director, National Sales; Steve Greenstein, Director, National Accounts, Sales;

c.    **Impax:** William Ball, Senior National Accounts Manager; Danny Darnell, Senior National Accounts Manager; Todd Engle, Senior Director, Sales Operations; Gary Skalski, Senior Director of Sales.

135.    On June 3-4, 2014, GPhA held a meeting in Bethesda, Maryland that was attended by representatives from at least Defendants, Hi-Tech, Fougera, Impax, and Sandoz.

136.    On August 23-26, 2014, NACDS held its 2014 Total Store Expo at the Boston Convention Center in Boston, Massachusetts. NACDS's August 2014 Total Store Expo was attended by the following representatives from all Defendants, including at least the following key executives for generic drug sales and pricing:

a.    **Akorn**: Ed Berrios, VP, Sales and Marketing - Hi-Tech Pharmacal Co., Inc.; Michael Corley, VP, National Accounts; Thomas Kronovich, VP, National

46

Accounts; Bruce Kutinsky, Chief Operating Officer; Mick McCanna, Executive Director of National Accounts; Raj Rai Chief, Executive Officer; John Sabat, Senior Vice President of National Accounts; M. Tranter, National Accounts Manager, Sales & Marketing;

b.    **Impax:** Chris Gerber, Director of Pricing and Contracts; Italo Pennella, Trade Account Manager; Dan Rozmiarek, Trade Account Manager; and

c.    **Sandoz**: Lisa Badura, Director, Key Customers; Christopher Bihari, Director, Key Customers; Steven Greenstein, Director, Key Customers; Anuj Hasija, Executive Director Key Customers; Armondo Kellum, Vice President, Sales and Marketing; Della Lubke, National Account Executive; Scott Smith, VP Sales & Marketing; Arunesh Verma, Executive Director Marketing; Sean Walsh, Director, Key Customers.

137.    On October 27-29, 2014, GPhA held its Fall Technical Conference in Bethesda, Maryland that was attended by representatives from at least Defendants Impax, Fougera, and Sandoz.

138.    In 2015, and 2016, Defendants continued to regularly attend trade association meetings, conferences and events, including: (i) the February 9-11, 2015 GPhA Annual Meeting in Miami, Florida; (ii) ███████████████████████

████████████████████████████████████████████████

(iii) the April 25-28, 2015 NACDS Annual Meeting in Palm Beach, Florida; (iv) the June 7-10, 2015 HDMA BLC in San Antonio, Texas; (v) the June 9-10, 2015 GPhA meeting in Bethesda, Maryland; (vi) the August 22-25, 2015 NACDS Total Store Expo in Denver, Colorado; (vii) the

47

November 2-4, 2015 GPhA meeting in Bethesda, Maryland; (viii) the April 16-19, 2016 NACDS Annual Meeting in Palm Beach, Florida; (ix) the June 12-16, 2016 HDMA BLC in Colorado Springs, Colorado; and (x) the August 6-9, 2016, NACDS 2016 Total Store Expo in Boston, Massachusetts.

139.    As uncovered in the State AGs' ongoing investigation, at these various conferences and trade shows, representatives from Defendants, as well as other generic drug manufacturers, discussed their respective businesses and customers.  These discussions would occur at social events, including lunches, cocktail parties, dinners, and golf outings, that usually accompanied these conferences and trade shows. Defendants' employees used these opportunities to discuss and share upcoming bids, specific generic drug markets, pricing strategies and pricing terms in their contracts with customers.[61]

140.    In conjunction with meetings at conferences and trade shows, representatives of generic drug manufacturers get together separately, in more limited groups, allowing them to further meet face-to-face with their competitors and discuss their business.  In fact, high-level executives of many generic drug manufacturers get together periodically for what at least some of them refer to as "industry dinners."[62]

141.    A large number of generic drug manufacturers, including Defendants Impax, Hi-Tech, and Sandoz are headquartered or have major offices in close proximity to one another in New Jersey, New York, and eastern Pennsylvania, giving them easier and more frequent opportunities to meet and collude. For example, in January 2014, at a time when the prices of a

---

[61] *See, e.g.*, State AG Complaint ¶¶ 50-52.

[62] *Id.* ¶¶ 53-60.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

number of generic drugs were reportedly soaring, at least thirteen high-ranking male executives, including CEOs, Presidents, and Senior Vice Presidents of various generic drug manufacturers, met at a steakhouse in Bridgewater, New Jersey.

142.    Generic drug manufacturer employees also get together regularly for what is referred to as a "Girls' Night Out" ("GNO"), or alternatively "Women in the Industry" meetings and dinners.   During these GNOs, meetings and dinners, these employees meet with their competitors and discuss competitively sensitive information.   Several different GNOs were held in 2015, including: (1) in Baltimore, Maryland in May, and (2) at the NACDS conference in August.

143.    Through these various interactions, Defendants' employees are often acutely aware of their competition and, more importantly, each other's current and future business plans. This familiarity and opportunity often leads to agreements among competitors to fix prices or to allocate a given market so as to avoid competing with one another on price.

144.    Defendants also routinely communicate and share information with each other about bids and pricing strategy.   This can include forwarding bid packages received from a customer (*e.g.*, a Request for Proposal or "RFP") to a competitor, either on their own initiative, at the request of a competitor, or by contacting a competitor to request that the competitor share that type of information.

145.    Additionally, Defendants share information regarding the terms of their contracts with customers, including various terms relating to pricing, price protection, and rebates. Defendants use this information from their competitors to negotiate potentially better prices or terms with their customers, which could be to the ultimate detriment of consumers.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

### E.     Defendants' Concerted Efforts to Increase Prices for Generic Lidocaine-Prilocaine Yielded Supracompetitive Profits

146.     Defendants' agreement to inflate the prices of generic Lidocaine-Prilocaine resulted in increased revenues and higher profits.

147.     For example, Impax experienced $596 million in total revenues in the 2014 calendar year, as compared to $511 million in 2013, which is a 17% increase.[63]

148.     Akorn's total revenues increased from $233 million during the nine months preceding September 2013 to $374 million during the nine months preceding September 2014, an increase of 61%.[64]

### F.     Factors Increasing the Market's Susceptibility to Collusion

149.     Publicly available data on the generic Lidocaine-Prilocaine market in the United States demonstrate that it is susceptible to cartelization by Defendants. Factors that make a market susceptible to collusion include: (1) a high degree of industry concentration; (2) significant barriers to entry; (3) inelastic demand; (4) the lack of available substitutes for the goods involved; (5) a standardized product with a high degree of interchangeability between the products of cartel participants; and (6) inter-competitor contacts and communication.

#### 1.     Industry Concentration

150.     A high degree of concentration facilitates the operation of a cartel because it makes it easier to coordinate behavior among co-conspirators. Here, Defendants controlled approximately ████ of the generic Lidocaine-Prilocaine market in June 2014.

---

[63] Impax, SEC 2014 Form 10-K, *available at* http://d1lge852tjjqow.cloudfront.net/CIK-0001003642/c545ab21-aa3d-4426-a0b9-ba4373b6c213.pdf?noexit=true.

[64] Akorn Inc., SEC Form 10-Q (Nov. 2014), *available at* https://www.sec.gov/Archives/edgar/data/3116/000117184314005410/f10q_111014.htm.

50

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

151.    In the United States, generic Lidocaine-Prilocaine cream has an extremely high HHI, as noted above, which makes the market for this product an excellent candidate for collusion.

152.    While the market for Lidocaine-Prilocaine is sufficiently concentrated to facilitate collusion, the years of low and stable pricing in the market establish that the number of manufacturers in the market was sufficient to drive competition. Absent collusion, prices would have remained at competitive levels.

153.    No departures from the market by manufacturers of Lidocaine-Prilocaine can explain the price increases.

154.    The price increases here are extreme – Sandoz's generic Lidocaine-Prilocaine prices jumped approximately ▮▮▮▮over the course of 6 months, followed closely by the other Defendants. Such extreme pricing moves are not rational in the absence of advance knowledge that competitors will join the increase.

### 2.    Barriers to Entry

155.    Supracompetitive pricing in a market normally attracts additional competitors who want to avail themselves of the high levels of profitability that are available. However, the presence of significant barriers to entry makes this more difficult and helps to facilitate the operation of a cartel.

156.    There are significant capital, regulatory, and intellectual property barriers to entry in the generic Lidocaine-Prilocaine market that make such entry time-consuming and expensive.

157.    Start-up costs and regulatory oversight represent substantial barriers to entry in the generic Lidocaine-Prilocaine markets.

51

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

158.    In addition to the significant out-of-pocket costs required to bring a drug to market, the approval process for generic drugs takes significant time. As Kansas Senator Jerry Moran commented on September 21, 2016 during Congressional hearings on the FDA's role in the generic drug market, "there are more than 4,000 generic drug applications currently awaiting approval, and the median time it takes for the FDA to approve a generic is now 47 months or nearly four years."[65] This significant delay for new market entrants effectively precludes new competition from eroding the supracompetitive prices imposed by the conspiracy.

159.    According to the IMS data, no new competitors entered the generic Lidocaine-Prilocaine market ████████████████████—the sole exception being Actavis (Teva), which managed to enter the market due to its divestment agreement with Akorn, an agreement that the FTC imposed on Akorn as a condition for Akorn's acquisition of Hi-Tech in April of 2014. *See* ¶¶ 75-76.

### 3.    Demand Inelasticity

160.    Price elasticity of demand is defined as the measure of responsiveness in the quantity demanded for a product as a result of change in price of the same product. It is a measure of how demand for a product reacts to a change in price. The basic necessities of life—food, water, and shelter—are examples of goods that experience nearly perfectly inelastic demand at or near the minimums necessary to sustain life.  In other words, a person on the verge of dying of thirst will pay almost anything for water.

---

[65] Sen. Moran, Statement (Sep. 21, 2016), *available at* http://www.appropriations.senate.gov/imo/media/doc/092116-Chairman-Moran-Opening-Statement.pdf.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

161.    In order for a cartel to profit from raising prices above competitive levels, demand for the product must be sufficiently inelastic such that any loss in sales will be more than offset by increases in revenue on those sales that are made. Otherwise, increased prices would result in declining sales, revenues, and profits as customers purchased substitute products or declined to buy altogether. Inelastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering customer substitution and lost sales revenue.

162.    Demand for generic Lidocaine-Prilocaine is highly inelastic because it is a unique product for which there are no reasonable substitutes. When doctors prescribe generic Lidocaine-Prilocaine, patients have little choice but to buy it at the price offered. This gives Defendants significant pricing power, as well as an incentive to collude.

163.    Thus, generic Lidocaine-Prilocaine is an excellent candidate for cartelization because price increases will result in more revenue, rather than less, provided that most or all manufacturers participate.

### 4.    Lack of Substitutes

164.    There are no reasonable substitutes for Lidocaine-Prilocaine. Lidocaine and prilocaine, the active ingredients in Lidocaine-Prilocaine, are unique compounds that are not therapeutically equivalent to other treatments. Further, when used in combination, lidocaine and prilocaine are similarly unique and lack therapeutic equivalence.

165.    In addition, branded versions of Lidocaine-Prilocaine do not serve as economic substitutes for generic versions of these compounds because branded products generally maintain substantial price premiums over even their supra-competitively priced generic counterparts, making them inapt substitutes even when generic prices soar.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

166.    Thus, purchasers of generic Lidocaine-Prilocaine are held captive to the supracompetitive prices that resulted from Defendants' conspiracy to fix prices and allocate markets and customers.

### 5.    Standardized Product with High Degree of Interchangeability

167.    A commodity-like product is one that is standardized across suppliers and allows for a high degree of substitutability among different suppliers in the market. When products offered by different suppliers are viewed as interchangeable by purchasers, it is easier for the suppliers to agree on prices for the goods in question and to monitor those prices effectively. Here, the Lidocaine-Prilocaine made by the Defendant manufacturers each contain identical active ingredients, are bioequivalent, and are viewed as interchangeable by the pharmacies that fill the prescriptions.

168.    Generic drugs of the same chemical composition are effectively commodity products because the primary mechanism through which they compete is price. When approving an ANDA, the FDA confirms that a generic drug product is bioequivalent to the branded version of the drug.  This allows pharmacists to substitute that generic for the branded counterpart, as well as for any other generic that also is bioequivalent to the branded product.

169.    Defendants' generic Lidocaine-Prilocaine products are bioequivalent generics of their branded counterparts, enabling pharmacists to substitute them (any of them) for branded products.

170.    Moreover, because generic Lidocaine-Prilocaine products are interchangeable, there is little utility in attempting to distinguish the products based on quality, branding or service.  Accordingly, manufacturers generally spend little effort advertising or detailing (the

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

practice of providing promotional materials and free samples to physicians) their generic compounds. The primary means for one generic manufacturer to differentiate its product from another's is through price competition.[66] The need to compete on price can drive producers of commodity products to conspire—as they did here—to fix prices.

### 6. Inter-Competitor Contacts and Communications

171. As discussed above, Defendants' representatives frequently met at conferences convened by customers and trade associations of customers (such as the ECRM and NACDS), private industry dinners, and similar events. Moreover, Defendants are members of and/or participants of the GPhA; thus, their representatives have many opportunities to meet and conspire at industry meetings. As noted in press reports, "prosecutors are taking a close look at trade associations as part of their investigation as having been one potential avenue for facilitating the collusion between salespeople at different generic producers."[67]

172. The State AG Complaint alleges that Defendants routinely coordinated their schemes through direct interaction with their competitors at industry trade shows, customer conferences, and other events. For example, Defendants Glazer and Malek admitted at their guilty plea hearings to engaging in discussions and attending meetings with competitors, during which they reached agreements to allocate customers, rig bids and fix prices of doxycycline hyclate and glyburide.

---

[66] *See, e.g.*, GAO Report at 23 ("If another manufacturer offers a lower price to a customer, manufacturers we interviewed indicated that they are usually asked to match it or risk losing market share to the other manufacturer.").

[67] PaRR Report.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

173.    DOJ's and the Connecticut AG's investigations, and the grand jury subpoenas and investigative demands that have issued in conjunction with them, focus on inter-competitor communications. These types of communications are not unique or isolated, but are rampant; "[g]eneric drug manufacturers operate, through their respective senior leadership and marketing and sales executives, in a manner that fosters and promotes routine and direct interaction among their competitors."[68] The sheer number of companies implicated in the investigations highlights the prevalence in the generic drug industry of the types of contacts and communications that facilitate collusion:

a.    **Actavis**: In February 2016, Actavis's former corporate parent, Allergan plc, disclosed that it received a DOJ subpoena "seeking information relating to the marketing and pricing of certain of the Company's generic products and communications with competitors about such products."[69]

b.    **Aurobindo**: Aurobindo has disclosed receipt of a subpoena relating to DOJ's generic drug investigation.[70] The company stated that it "received a subpoena in Mar[ch] 2016 requesting non-product specific information."[71]

---

[68] State AG Complaint ¶ 7.

[69] Allergan, SEC 2015 Form 10-K (Feb. 26, 2016), at F-106, *available at* https://www.sec.gov/Archives/edgar/data/1578845/000156459016013478/agn-10k_20151231.htm.

[70] Zeba Siddiqui, India's Aurobindo shares hit nine-month low on US price-fixing lawsuit, Reuters (Dec 16, 2016), *available at* http://www.reuters.com/article/us-aurobindo-pharm-stocks-idUSKBN1450DV.

[71] Aurobindo Pharma, Ltd., BSE Disclosure (Dec. 16, 2016), *available at* http://www.bseindia.com/xml-data/corpfiling/AttachHis/3C8E03C7_A46F_4792_AED5_197E6961A77E_125855.pdf.

56

c. **Citron**:  In December 2016, Aceto Corporation (which purchased Citron's generic drugs assets) disclosed that DOJ "executed a search warrant against the Company and also served a subpoena requesting documents and other information concerning  potential  antitrust  violations  in  the  sale  of  Glyburide, Glyburide/Metformin,  and  Fosinopril  HCTZ  products."  The  Connecticut  AG requested that Citron produce all documents produced to DOJ.[72]

d. **Dr. Reddy's**:  In November 2016, Dr. Reddy's disclosed that it received subpoenas from DOJ and the Connecticut AG "seeking information relating to the marketing,  pricing  and  sale  of  certain  .  .  .  generic  products  and  any communications with competitors about such products."[73]

e. **Heritage**:  As a private company, Heritage is not required to make public disclosures.  Nonetheless, in the wake of the criminal guilty pleas by two of its executives, Heritage confirmed that it is "fully cooperating" with DOJ[74] and press reports indicate that Heritage has applied to DOJ's leniency program seeking amnesty for a cartel violation.[75]

---

[72] Aceto Corp., SEC Form 8-K, Ex. 99.5, *available at* https://www.sec.gov/Archives/edgar/data/2034/000157104916020771/t1600804_ex99-5.htm.

[73] Dr. Reddy's, SEC Form 6-K (Nov. 10, 2016), *available at* http://www.drreddys.com/investors/reports-and-filings/sec-filings/?year=FY17.

[74] Tom Schoenberg, David McLaughlin & Sophia Pearson, *U.S. Generic Drug Probe Seen Expanding After Guilty Pleas,* Bloomberg (Dec. 14, 2016), *available at* https://www.bloomberg.com/news/articles/2016-12-14/u-s-files-first-charges-in-generic-drug-price-fixing-probe.

[75] *See supra* ¶ 22.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

f.   **Impax**:  In July 2014, Defendant Impax disclosed that it received a subpoena from the Connecticut AG concerning sales of generic digoxin.[76]  In November 2014, Impax disclosed that an employee received a broader federal grand jury subpoena that requested testimony and documents about "any communication or correspondence with any competitor (or an employee of any competitor) in the sale of generic prescription medications."[77] In February 2016, Impax disclosed that it received a DOJ subpoena requesting "information and documents regarding the sales, marketing, and pricing of certain generic prescription medications. In particular… digoxin tablets, terbutaline sulfate tablets, prilocaine/lidocaine cream, and calcipotriene topical solution."[78]

g.   **Lannett**: In July 2014, Lannett disclosed that it received a subpoena from the Connecticut AG relating to its investigation into the price fixing of digoxin.[79] On November 3, 2014, Lannett disclosed that a Senior Vice President of Sales and Marketing was served with a grand jury subpoena "relating to a federal investigation of the generic pharmaceutical industry into possible violations of the Sherman Act." The subpoena also requested "corporate documents of the

---

[76] Impax SEC Form 8-K (July 15, 2014), *available at* https://www.sec.gov/Archives/edgar/data/1003642/000143774914012809/ipxl20140715_8k.htm.

[77] Impax SEC Form 8-K (Nov. 6, 2014), *available at* https://www.sec.gov/Archives/edgar/data/1003642/000119312514402210/d816555d8k.htm.

[78] Impax, SEC 2015 Form 10-K (Feb. 22, 2016), at F-53, *available at* https://www.sec.gov/Archives/edgar/data/1003642/000143774916025780/ipxl20151231_10k.htm.

[79] Lannett Press Release (July 16, 2014), *available at* http://lannett.investorroom.com/2014-07-16-Lannett-Receives-Inquiry-From-Connecticut-Attorney-General.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Company relating to communications or correspondence with competitors regarding the sale of generic prescription medications, but is not specifically directed to any particular product and is not limited to any particular time period."[80]   On August 27, 2015, Lannett further explained that DOJ sought, among other things, "communications or correspondence with competitors regarding the sale of generic prescription medications, and the marketing, sale, or pricing of certain products, generally for the period of 2005 through the dates of the subpoenas."[81]

h.   **Mayne**:   On August 25, 2016, Mayne Pharma Group Limited (the parent of Mayne) disclosed that it was "one of numerous generic pharmaceutical companies to receive a subpoena…seeking information relating to marketing, pricing and sales of select generic products" and that it had received a subpoena from the Connecticut AG seeking similar information.[82]   On November 4, 2016, Mayne Pharma Group Limited issued a press release stating: "Previously on 28 Jun[e] 2016, Mayne Pharma Group Limited disclosed that it was one of several generic companies to receive a subpoena from the Antitrust Division of the US Department of Justice (DOJ) seeking information relating to the marketing, pricing and sales of select generic products. The investigation relating to Mayne

---

[80] Lannett, SEC Form 10-Q (Nov. 6, 2014) at 16, *available at* https://www.sec.gov/Archives/edgar/data/57725/000110465914077456/a14-20842_110q.htm.

[81] Lannett, SEC Form 10-K (Aug. 27, 2015) at 18, available at http://www.sec.gov/Archives/edgar/data/57725/000110465915062047/a15-13005_110k.htm.

[82] Mayne Pharma, 2016 Annual Report (Aug. 25, 2016), at 75, *available at* https://www.maynepharma.com/media/1788/2016-mayne-pharma-annual-report.pdf.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Pharma is focused on doxycycline hyclate delayed-release tablets (generic) and potassium chloride powders."[83]

i.    **Mylan**:  In February 2016, Mylan disclosed that it received a DOJ subpoena "seeking information relating to…generic Doxycycline" and a similar subpoena from the Connecticut AG seeking "information relating to…certain of the Company's generic products (including Doxycycline) and communications with competitors about such products."[84] On Nov. 9, 2016, Mylan disclosed that "certain employees and a member of senior management, received subpoenas from the DOJ seeking additional information relating to the marketing, pricing and sale of our generic Cidofovir, Glipizide-metformin, Propranolol and Verapamil products" and that "[r]elated search warrants also were executed" in connection with DOJ's investigation.[85]

j.    **Par**:  In March 2015, Par disclosed that it received subpoenas from the Connecticut AG and DOJ relating to digoxin and doxycycline.[86] In November 2015, Endo International plc, the parent company of Par, elaborated: "In

---

[83] Mayne Pharma, Update on DOJ Investigation (Nov. 4, 2016), *available at* http://asxcomnewspdfs.fairfaxmedia.com.au/2016/11/04/01798874-137879061.pdf.

[84] Mylan, SEC 2015 Form 10-K (Feb. 16, 2016), at 160, *available at* https://www.sec.gov/Archives/edgar/data/1623613/000162361316000046/myl10k_20151231xdoc.htm.

[85] Mylan SEC Form 10-Q, at 58 (Nov. 9, 2016), *available at* https://www.sec.gov/Archives/edgar/data/1623613/000162361316000071/myl10q_20160930xdoc.htm.

[86] Par Pharmaceuticals Companies, Inc., SEC 2014 Form 10-K (Mar. 12, 2015) at 37, *available at* https://www.sec.gov/Archives/edgar/data/878088/000087808815000002/prx-20141231x10k.htm.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

December 2014, our subsidiary, Par, received a Subpoena to Testify Before Grand Jury from the Antitrust Division of the DOJ and issued by the U.S. District Court for the Eastern District of Pennsylvania. The subpoena requests documents and information focused primarily on product and pricing information relating to Par's authorized generic version of Lanoxin (digoxin) oral tablets and Par's generic doxycycline products, and on communications with competitors and others regarding those products. Par is currently cooperating fully with the investigation."[87] Endo also disclosed that in December 2015 it "received Interrogatories and Subpoena Duces Tecum from the State of Connecticut Office of Attorney General requesting information regarding pricing of certain of its generic products, including Doxycycline Hyclate, Amitriptyline Hydrochloride, Doxazosin Mesylate, Methotrexate Sodium and Oxybutynin Chloride."[88]

k.    **Perrigo**:  On May 2, 2017, Perrigo disclosed that "search warrants were executed at the Company's corporate offices associated with an ongoing investigation by the U.S. Department of Justice Antitrust Division related to drug pricing in the pharmaceutical industry."[89]

l.    **Pfizer:**   On August 10, 2017, Pfizer disclosed: "As of July 2017, the U.S. Department of Justice's Antitrust Division is investigating our Greenstone

---

[87] Endo International plc, SEC Form 10-Q (March 31, 2016) at 30, *available at* https://www.sec.gov/Archives/edgar/data/1593034/000159303416000056/endp-3312016x10q.htm.

[88] *Id.* at 31.

[89] Perrigo Press Release (May 2, 2017), *available at* http://perrigo.investorroom.com/2017-05-02-Perrigo-Discloses-Investigation.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

generics business. We believe this is related to an ongoing antitrust investigation of the generic pharmaceutical industry. The government has been obtaining information from Greenstone."[90]

m. **Sandoz**:  In March 2016, Sandoz and Fougera Pharmaceuticals Inc. (a wholly-owned subsidiary of Sandoz) "received a subpoena from the Antitrust Division of the US Department of Justice (DoJ) requesting documents related to the marketing and pricing of generic pharmaceutical products sold by Sandoz Inc. and its subsidiaries, including Fougera Pharmaceuticals, Inc. (Fougera), and related communications with competitors."[91]

n. **Sun**:  On May 27, 2016, Sun Pharmaceutical Industries, Ltd. (the parent of Sun) stated in a filing with the National Stock Exchange of India that one of its U.S subsidiaries, namely Sun, "received a grand jury subpoena from the United States Department of Justice, Antitrust Division seeking documents…relating to corporate and employee records, generic pharmaceutical products and pricing, communications with competitors and others regarding the sale of generic pharmaceutical products, and certain other related matters."[92]

---

[90] Pfizer, SEC Form 10-Q (Aug. 10, 2017) at 37, *available at* https://investors.pfizer.com/financials/sec-filings/sec-filings-details/default.aspx?FilingId=12225193.

[91] Novartis 2016 Financial Report at 217, *available at* https://www.novartis.com/sites/www.novartis.com/files/ar-2016-financial-report-en.pdf.

[92] Sun Pharmaceuticals Indus., Ltd., BSE Disclosure (May 27, 2016), *available at* http://www.bseindia.com/xml-data/corpfiling/AttachHis/8E568708_8D00_472E_B052_666C76A4263D_081648.pdf.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

o.  **Taro**:  In September 2016, Taro disclosed that the Company "and two senior officers" received DOJ subpoenas seeking documents relating to "generic pharmaceutical products and pricing, communications with competitors and others regarding the sale of generic pharmaceutical products, and certain other related matters."[93]

p.  **Teva**:  In August 2016, Teva disclosed that it received subpoenas from DOJ and the Connecticut AG seeking documents and other information "relating to the marketing and pricing of certain of Teva USA's generic products and communications with competitors about such products."[94]

q.  **Zydus**:  Press reports have stated the Zydus is a target of DOJ's generic drugs price-fixing investigation.[95]

X.   **THE STATUTES OF LIMITATIONS DO NOT BAR PLAINTIFFS' CLAIMS**

A.   **The Statutes of Limitations Did Not Begin to Run Because Plaintiffs Did Not and Could Not Discover Defendants' Unlawful Conspiracy**

174.   Plaintiffs had no knowledge of the combination or conspiracy alleged herein, or of facts sufficient to place them on inquiry notice of the claims set forth herein, until (at the earliest) Defendants' disclosures of the existence of the government investigations and subpoenas. Prior to that time, no information in the public domain or available to Plaintiffs

---

[93] Taro, SEC Form 6-K (Sept. 9, 2016), *available at* https://www.sec.gov/Archives/edgar/data/906338/000115752316006685/a51417528.htm.

[94] Teva, SEC Form 6-K at 25 (Aug. 4, 2016), *available at* https://www.sec.gov/Archives/edgar/data/818686/000119312516671785/d187194d6k.htm.

[95] *See* Rupali Mukherjeel, *US polls, pricing pressure may hit Indian pharma cos,* The Times of India (Nov. 8, 2016), *available at* http://timesofindia.indiatimes.com/business/india-business/US-polls-pricing-pressure-may-hit-Indian- pharma-cos/articleshow/55301060.cms.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

suggested that any Defendant was involved in a criminal conspiracy to fix prices for generic Lidocaine-Prilocaine.

175.    No information evidencing antitrust violations was available in the public domain prior to the public announcements of the government investigations that revealed sufficient information to suggest that any of the defendants was involved in a criminal conspiracy to fix prices for generic Lidocaine-Prilocaine.

176.    Plaintiffs are purchasers who indirectly purchased generic Lidocaine-Prilocaine manufactured by one or more Defendants. They had no direct contact or interaction with any of the Defendants in this case and had no means from which they could have discovered Defendants' conspiracy.

177.    Defendants repeatedly and expressly stated throughout the Class Period, including on their public Internet websites, that they maintained antitrust/fair competition policies which prohibited the type of collusion alleged in this Complaint. For example:

   a.    Impax's Code of Conduct provides: "Impax is committed to free and open competition in the marketplace, and requires employees to strictly adhere to the antitrust laws in the countries where we do business…. No employee may discuss with, or provide information to, any competitor about pricing or related matters, whether the information concerns Impax or its suppliers, distributors, wholesalers or customers."[96]

   b.    Novartis's (the parent of Sandoz and Fougera) Code of Conduct provides: "We are committed to fair competition and will not breach competition laws and regulations."[97]

---

[96] Impax Code of Conduct, *available at* http://s1.q4cdn.com/790711406/files/doc_downloads/Code-of-Conduct-2016.pdf.

[97] Novartis Code of Conduct, *available at* https://www.novartis.com/sites/www.novartis.com/files/code-of-conduct-english.pdf.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

    c.    Akorn's Code of Ethics provides: "Competitors cannot agree on or manipulate the prices they will charge for their products and services. You should never discuss our pricing or pricing practices with a competitor […] It is unlawful and against Akorn policy to collaborate or exchange information with competitors or to restrain competition in any way, such as by dividing customers or markets."[98]

178.    It was reasonable for members of the Class to believe that Defendants were complying with their own antitrust policies.

179.    For these reasons, the statutes of limitations as to Plaintiffs' claims under the federal and state common laws identified herein did not begin to run, and have been tolled with respect to the claims that Plaintiffs have alleged in this Complaint.

**B.**    **Fraudulent Concealment Tolled the Statutes of Limitations**

180.    In the alternative, application of the doctrine of fraudulent concealment tolled the statutes of limitations on the claims asserted by Plaintiffs. Plaintiffs had no knowledge of the combination or conspiracy alleged in this Complaint, or of facts sufficient to place them on inquiry notice of their claims, until Defendants disclosed the existence of government investigations and subpoenas. Prior to that time, no information in the public domain or available to Plaintiffs suggested that any Defendant was involved in a criminal conspiracy to fix prices for generic Lidocaine-Prilocaine.

181.    No information evidencing antitrust violations was available in the public domain prior to the public announcements of the government investigations that revealed sufficient information to suggest that any of the defendants was involved in a criminal conspiracy to fix prices for generic Lidocaine-Prilocaine.

---

[98] Akorn Code of Ethics, *available at* http://investors.akorn.com/phoenix.zhtml?c=78132&p=irol-govhighlights.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

182.   As described in more detail below, Defendants actively concealed, suppressed, and omitted to disclose material facts to Plaintiffs and members of the Classes concerning Defendants' unlawful activities to artificially inflate prices for generic Lidocaine-Prilocaine. The concealed, suppressed, and omitted facts would have been important to Plaintiffs and members of the Classes as they related to the cost of generic Lidocaine-Prilocaine they purchased. Defendants misrepresented the real cause of price increases and/or the absence of price reductions in generic Lidocaine-Prilocaine. Defendants' false statements and conduct concerning the prices of generic Lidocaine-Prilocaine were deceptive as they had the tendency or capacity to mislead Plaintiffs and members of the Classes to believe that they were purchasing generic Lidocaine-Prilocaine at prices established by a free and fair market.

### 1.   Active Concealment of the Conspiracy

183.   Defendants engaged in an illegal scheme to fix prices, allocate customers and rig bids. Criminal and civil penalties for engaging in such conduct are severe. Not surprisingly, Defendants took affirmative measures to conceal their conspiratorial conduct.

184.   Through their misleading, deceptive, false and fraudulent statements, Defendants effectively concealed their conspiracy, thereby causing economic harm to Plaintiffs and the Classes. Defendants' misrepresentations regarding their price changes were intended to lull Plaintiffs and the Classes into accepting the price hikes as a normal result of competitive and economic market trends rather than as the consequence of Defendants' collusive acts. The public statements made by Defendants were designed to mislead Plaintiffs and the Classes into paying unjustifiably higher prices for generic Lidocaine-Prilocaine.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

185.    As explained in the State AG complaint, the nature of the generic drug industry—which allows for frequent and repeated face-to-face meetings among competitors—means that "Most of the conspiratorial communications were intentionally done in person or by cell phone, in an attempt to avoid creating a record of their illegal conduct. The generic drug industry, through the aforementioned opportunities to collude at trade shows, customer events and smaller more intimate dinners and meetings, allowed these communications to perpetuate."[99]

186.    The Defendants also gave pretextual and misleading reasons for price increases. For example, Frederick Wilson, the CEO of Impax, spoke to this topic On Nov. 4, 2014 in a third quarter earnings call: "we've done what most of the other generic competitors have done, we look at opportunities, we look at how competition shifts, we look at where there may be some market movement that will allow us to take advantages on price increases and we've implemented those…."

187.    These types of false statements and others made by Defendants helped conceal the illegal conspiracy entered into by Defendants to fix, stabilize, maintain and raise the price of generic Lidocaine-Prilocaine to inflated, supracompetitive levels.

### 2.    Plaintiffs Exercised Reasonable Diligence

188.    Defendants' anticompetitive conspiracy, by its very nature, was self-concealing. Generic drugs are not exempt from antitrust regulation, and thus, before the disclosure of the government investigations, Plaintiffs reasonably considered the markets to be competitive. Accordingly, a reasonable person under the circumstances would not have been alerted to investigate the legitimacy of Defendants' prices before these disclosures.

---

[99] State AG Complaint ¶ 13.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

189.    Because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to conceal their illicit conduct, Plaintiffs and the Classes could not have discovered the conspiracy at an earlier date by the exercise of reasonable diligence.

190.    Therefore, the running of any statutes of limitations has been tolled for all claims alleged by Plaintiffs and the Classes as a result of Defendants' anticompetitive and unlawful conduct.  Despite the exercise of reasonable diligence, Plaintiffs and Members of the Classes were unaware of Defendants' unlawful conduct, and did not know that they were paying supracompetitive prices throughout the United States during the Class Period.

191.    For these reasons, Plaintiffs' claims are timely under all of the federal, state and common laws identified herein.

## XI.    CONTINUING VIOLATIONS

192.    This Complaint alleges a continuing course of conduct (including conduct within the limitations periods), and defendants' unlawful conduct has inflicted continuing and accumulating harm within the applicable statutes of limitations. Thus, Plaintiffs and the members of the Damages Class can recover for damages that they suffered during any applicable limitations period.

## XII.    DEFENDANTS' ANTITRUST VIOLATIONS

193.    During the Class Period, set forth below, Defendants engaged in a continuing agreement, understanding, and conspiracy in restraint of trade to allocate customers, rig bids, and fix raise and/or stabilize prices for generic Lidocaine-Prilocaine sold in the United States.

68

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

194.    In formulating and effectuating the contract, combination or conspiracy, Defendants identified above and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which were to allocate customers, rig bids and artificially fix, raise, maintain, and/or stabilize the price of generic Lidocaine-Prilocaine sold in the United States. These activities included the following:

a.      Defendants participated in meetings and/or conversations regarding the price of generic Lidocaine-Prilocaine in the United States;

b.      Defendants agreed during those meetings and conversations to charge prices at specified levels and otherwise to increase and/or maintain prices of generic Lidocaine-Prilocaine sold in the United States;

c.      Defendants agreed during those meetings and conversations to allocate customers, rig bids, and fix the price of generic Lidocaine-Prilocaine; and

d.      Defendants issued price announcements and price quotations in accordance with their agreements.

195.    Defendants and their co-conspirators engaged in the activities described above for the purpose of effectuating the unlawful agreements described in this Complaint.

196.    During and throughout the period of the conspiracy alleged in this Complaint, Plaintiffs and members of the Classes indirectly purchased generic Lidocaine-Prilocaine at inflated and supracompetitive prices.

197.    Defendants' contract, combination and conspiracy constitutes an unreasonable restraint of trade and commerce in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3) and the laws of various End-Payer Damages Jurisdictions enumerated below.

69

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

198.     As a result of Defendants' unlawful conduct, Plaintiffs and the other members of the Classes have been injured in their business and property in that they have paid more for generic Lidocaine-Prilocaine than they would have paid in a competitive market.

199.     General economic principles recognize that any overcharge at a higher level of distribution generally results in higher prices at every level below. Moreover, the institutional structure of pricing and regulation in the pharmaceutical drug industry assures that overcharges at the higher level of distribution are passed on to end-payers such as Plaintiffs. Wholesalers and retailers passed on the inflated prices to Plaintiffs and members of the Class. The impairment of generic competition at the direct purchaser level similarly injured Plaintiffs who were equally denied the opportunity to purchase less expensive generic versions of Lidocaine-Prilocaine.

200.     The unlawful contract, combination and conspiracy has had the following effects, among others:

a.     price competition in the market for generic Lidocaine-Prilocaine has been artificially restrained;

b.     prices for generic Lidocaine-Prilocaine sold by Defendants have been raised, fixed, maintained, or stabilized at artificially high and non-competitive levels; and

c.     end-payer purchasers of generic Lidocaine-Prilocaine sold by Defendants have been deprived of the benefit of free and open competition in the market for generic Lidocaine-Prilocaine.

70

# XIII.   CLASS ACTION ALLEGATIONS

201.   Plaintiffs bring this action on behalf of themselves and as a class action under Rules 23(a) and (b)(2) of the Federal Rules of Civil Procedure, seeking equitable and injunctive relief on behalf of the following class (the "Nationwide Class"):

> All persons and entities in the United States and its territories who indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price for Defendants' Lidocaine-Prilocaine products (generic Lidocaine-Prilocaine cream 2.5-2.5%, 30 gm), other than for resale, from March 1, 2014 through the present (the "Class Period").

> This class excludes: (a) Defendants, their officers, directors, management, employees, subsidiaries, and affiliates; (b) all federal and state governmental entities except for cities, towns, municipalities, or counties with self-funded prescription drug plans; (c) all persons or entities who purchased Defendants' generic Lidocaine-Prilocaine products for purposes of resale or directly from Defendants; (d) fully insured health plans (*i.e.*, health plans that purchased insurance covering 100% of their reimbursement obligation to members); (e) any "flat co-pay" consumers whose purchases of Defendants' generic Lidocaine-Prilocaine products were paid in part by a third party payer and whose co-payment was the same regardless of the retail purchase price; (f) pharmacy benefit managers; and (g) any judges or justices involved in this action and any members of their immediate families.

202.   Plaintiffs also bring this action on behalf of themselves and as a class action under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking damages pursuant to the common law of unjust enrichment and the state antitrust, unfair competition, and consumer protection laws of the states and territories listed below (the "End-Payer Damages Jurisdictions")[100] on behalf of the following class (the "Damages Class"):

---

[100] The "End-Payer Damages Jurisdictions" include all States (except Indiana and Ohio), as well as the District of Columbia, Puerto Rico, and the U.S. Virgin Islands.

71

All persons and entities in the End-Payer Damages Jurisdictions who indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price for Defendants' Lidocaine-Prilocaine products (generic Lidocaine-Prilocaine cream 2.5-2.5%, 30 gm), other than for resale, from March 1, 2014 through the present (the "Class Period").

This class excludes: (a) Defendants, their officers, directors, management, employees, subsidiaries, and affiliates; (b) all federal and state governmental entities, except for cities, towns, municipalities, or counties with self-funded prescription drug plans; (c) all persons or entities who purchased Defendants' generic Lidocaine-Prilocaine products for purposes of resale or directly from Defendants; (d) fully insured health plans (i.e., health plans that purchased insurance covering 100% of their reimbursement obligation to members); (e) any "flat co-pay" consumers whose purchases of Defendants' generic Lidocaine-Prilocaine products were paid in part by a third party payer and whose co-payment was the same regardless of the retail purchase price; (f) pharmacy benefit managers; and (g) any judges or justices involved in this action and any members of their immediate families.

203.    The Nationwide Class and the Damages Class are referred to herein as the "Classes."

204.    While Plaintiffs do not know the exact number of the members of the Classes, Plaintiffs believe there are thousands of members in each Class.

205.    Common questions of law and fact exist as to all members of the Classes. This is particularly true given the nature of Defendants' conspiracy, which was generally applicable to all the members of both Classes, thereby making appropriate relief with respect to the Classes as a whole. Such questions of law and fact common to the Classes include, but are not limited to:

a.    Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain and/or stabilize prices of generic

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Lidocaine-Prilocaine and/or engaged in market allocation for generic Lidocaine-Prilocaine sold in the United States;

b.      The identity of the participants of the alleged conspiracy;

c.      The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

d.      Whether the alleged conspiracy violated the Sherman Act, as alleged in the First Count;

e.      Whether the alleged conspiracy violated state antitrust and unfair competition laws, and/or state consumer protection laws, as alleged in the Second and Third Counts;

f.      Whether Defendants unjustly enriched themselves to the detriment of the Plaintiffs and the members of the Classes, thereby entitling Plaintiffs and the members of the Classes to disgorgement of all benefits derived by Defendants, as alleged in the Fourth Count;

g.      Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiffs and the members of the Classes;

h.      The effect of the alleged conspiracy on the prices of generic Lidocaine-Prilocaine sold in the United States during the Class Period;

i.      Whether the Defendants and their co-conspirators actively concealed, suppressed, and omitted to disclose material facts to Plaintiffs and members of the Classes concerning Defendants' unlawful activities to artificially inflate prices for generic Lidocaine-

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Prilocaine, and/or fraudulently concealed the unlawful conspiracy's existence from Plaintiffs and the other members of the Classes;

        j.      The appropriate injunctive and related equitable relief for the Nationwide Class; and

        k.      The appropriate class-wide measure of damages for the Damages Class.

206.    Plaintiffs' claims are typical of the claims of the members of the Classes. Plaintiffs and all members of the Classes are similarly affected by Defendants' wrongful conduct in that they paid artificially inflated prices for generic Lidocaine-Prilocaine purchased indirectly from Defendants and/or their co-conspirators. Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes.

207.    Plaintiffs will fairly and adequately protect the interests of the Classes. Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Classes. Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

208.    The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

209.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. The benefits of proceeding through the class

74

mechanism, including providing injured persons or entities with a method for obtaining redress for claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

210.    The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

### XIV.   CAUSES OF ACTION

### FIRST COUNT

### Violation of Sections 1 and 3 of the Sherman Act
### (on behalf of Plaintiffs and the Nationwide Class)

211.    Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

212.    Defendants and their unnamed co-conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

213.    During the Class Period, Defendants and their co-conspirators entered into a continuing agreement, understanding and conspiracy in restraint of trade to artificially allocate customers, rig bids and raise, maintain and fix prices for generic Lidocaine-Prilocaine, thereby creating anticompetitive effects.

214.    The conspiratorial acts and combinations have caused unreasonable restraints in the market for generic Lidocaine-Prilocaine.

215.    As a result of Defendants' unlawful conduct, Plaintiffs and other similarly situated End-Payers in the Nationwide Class who purchased generic Lidocaine-Prilocaine have

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

been harmed by being forced to pay inflated, supracompetitive prices for generic Lidocaine-Prilocaine.

216.     In formulating and carrying out the alleged agreement, understanding and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including, but not limited to, the acts, practices and course of conduct set forth herein.

217.     Defendants' conspiracy had the following effects, among others:

a.       Price competition in the market for generic Lidocaine-Prilocaine has been restrained, suppressed, and/or eliminated in the United States;

b.       Prices for generic Lidocaine-Prilocaine provided by Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States; and

c.       Plaintiffs and members of the Nationwide Class who purchased generic Lidocaine-Prilocaine indirectly from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

218.     Plaintiffs and members of the Nationwide Class have been injured and will continue to be injured in their business and property by paying more for generic Lidocaine-Prilocaine purchased indirectly from Defendants and the co-conspirators than they would have paid and will pay in the absence of the conspiracy.

219.     Defendants' contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

220.    Plaintiffs and members of the Nationwide Class are entitled to an injunction against Defendants, preventing and restraining the continuing violations alleged herein.

## SECOND COUNT

### Violation of State Antitrust Statutes[101]
### (on behalf of Plaintiffs and the Damages Class)

221.    Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

222.    During the Class Period, Defendants and their co-conspirators engaged in a continuing contract, combination or conspiracy with respect to the sale of generic Lidocaine-Prilocaine in unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

223.    The contract, combination, or conspiracy consisted of an agreement among Defendants and their co-conspirators to fix, raise, inflate, stabilize, and/or maintain the prices of generic Lidocaine-Prilocaine and to allocate customers for generic Lidocaine-Prilocaine in the United States.

224.    In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including: (a) participating in meetings and conversations among themselves in the United States and elsewhere during which they agreed to price generic Lidocaine-Prilocaine at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid by Plaintiffs and

---

[101] Statutory antitrust violations are alleged herein for the following jurisdictions: Arizona, California, Connecticut, District of Columbia, Hawaii, Illinois, Iowa, Kansas, Maine, Maryland, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia and Wisconsin.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

members of the Damages Class with respect to generic Lidocaine-Prilocaine provided in the United States; and (b) participating in meetings and trade association conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

225.    Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreement to allocate customers, rig bids, and fix prices for generic Lidocaine-Prilocaine.

226.    Defendants' anticompetitive acts described above were knowing, willful and constitute violations or flagrant violations of the following state antitrust statutes.

227.    [INTENTIONALLY LEFT BLANK]

**Arizona**

228.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Arizona Revised Statutes, § 44-1401, *et seq*. Defendants' combination and conspiracy had the following effects: (1) price competition for generic Lidocaine-Prilocaine was restrained, suppressed, and eliminated throughout Arizona; (2) generic Lidocaine-Prilocaine prices were raised, fixed, maintained and stabilized at artificially high levels throughout Arizona; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Lidocaine-Prilocaine. During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce. Defendants' violations of Arizona law were flagrant. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

injury. By reason of the foregoing, Defendants entered into an agreement in restraint of trade in violation of Ariz. Rev. Stat. § 44-1401, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Ariz. Rev. Stat. § 44-1401, *et seq*.

**California**

229.   Defendants have entered into an unlawful agreement in restraint of trade in violation of California Business and Professions Code § 16700 *et seq*. During the Class Period, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of California Business and Professions Code §16720. Defendants, and each of them, have acted in violation of § 16720 to fix, raise, stabilize, and maintain prices of generic Lidocaine-Prilocaine at supracompetitive levels. The aforesaid violations of § 16720 consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of generic Lidocaine-Prilocaine. For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including, but not limited to, the acts, practices and course of conduct set forth above and creating a price floor, fixing, raising, and stabilizing the price of generic Lidocaine-Prilocaine. The combination and conspiracy alleged herein has had, *inter alia*, the following effects: (1) price competition for generic Lidocaine-Prilocaine has been restrained, suppressed, and/or eliminated in the State of California; (2) prices for generic Lidocaine-Prilocaine provided by Defendants and their co-conspirators have been fixed, raised, stabilized, and pegged at artificially high, non-competitive levels in the State of California; and (3) those who purchased generic Lidocaine-Prilocaine

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

indirectly from Defendants and their co-conspirators have been deprived of the benefit of free and open competition. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property in that they paid more for generic Lidocaine-Prilocaine than they otherwise would have paid in the absence of Defendants' unlawful conduct. During the Class Period, Defendants' illegal conduct substantially affected California commerce. As a result of Defendants' violation of § 16720, Plaintiffs and members of the Damages Class seek treble damages and their cost of suit, including a reasonable attorney's fee, pursuant to California Business and Professions Code § 16750(a).

**Connecticut**

229(a). Defendants have entered into an unlawful agreement in restraint of trade in violation of the Connecticut Antitrust Act, Conn. Gen. Stat. § 35-35, *et seq*. Defendants' combinations and conspiracy had the following effects: (1) price competition for generic Lidocaine-Prilocaine was restrained, suppressed, and eliminated throughout Connecticut; (2) generic Lidocaine-Prilocaine prices were raised, fixed, maintained and stabilized at artificially high levels throughout Connecticut; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Lidocaine-Prilocaine. During the Class Period, Defendants' illegal conduct substantially affected Connecticut commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants entered into an agreement in restraint of trade in

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

violation of Conn. Gen. Stat. § 35-35, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Connecticut law.

**District of Columbia**

230.  Defendants have entered into an unlawful agreement in restraint of trade in violation of District of Columbia Code Annotated § 28-4501, *et seq*. Defendants' combination and conspiracy had the following effects: (1) generic Lidocaine-Prilocaine price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) generic Lidocaine-Prilocaine prices were raised, fixed, maintained and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiffs and members of the Damages Class, including those who resided in the District of Columbia and/or purchased generic Lidocaine-Prilocaine in the District of Columbia that were shipped by Defendants or their co-conspirators into the District of Columbia, were deprived of free and open competition, including in the District of Columbia; and (4) Plaintiffs and members of the Damages Class, including those who resided in the District of Columbia and/or purchased generic Lidocaine-Prilocaine in the District of Columbia that were shipped by Defendants or their co-conspirators, paid supracompetitive, artificially inflated prices for generic Lidocaine-Prilocaine, including in the District of Columbia. During the Class Period, Defendants' illegal conduct substantially affected District of Columbia commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of District of Columbia Code Ann. § 28-4501, *et seq.*

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under District of Columbia Code Ann. § 28-4501, *et seq*.

**Hawaii**

231.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Hawaii Revised Statutes Annotated § 480-1, *et seq*. Defendants' unlawful conduct had the following effects: (1) generic Lidocaine-Prilocaine price competition was restrained, suppressed, and eliminated throughout Hawaii; (2) generic Lidocaine-Prilocaine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Lidocaine-Prilocaine. During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Hawaii Revised Statutes Annotated § 480-4, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Hawaii Revised Statutes Annotated § 480-4, *et seq*.

**Illinois**

232.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the Illinois Antitrust Act (740 Illinois Compiled Statutes 10/1, *et seq*.) Defendants' combination or conspiracy had the following effects: (1) generic Lidocaine-Prilocaine price competition was restrained, suppressed, and eliminated throughout Illinois; (2) generic

82

Lidocaine-Prilocaine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Illinois; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Lidocaine-Prilocaine. During the Class Period, Defendants' illegal conduct substantially affected Illinois commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under the Illinois Antitrust Act.

**Iowa**

233.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Iowa Code § 553.1, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Lidocaine-Prilocaine price competition was restrained, suppressed, and eliminated throughout Iowa; (2) generic Lidocaine-Prilocaine prices were raised, fixed, maintained and stabilized at artificially high levels throughout Iowa; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Lidocaine-Prilocaine. During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Iowa Code § 553.1, *et seq*. Accordingly, Plaintiffs

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

and members of the Damages Class seek all forms of relief available under Iowa Code § 553, *et seq*.

**Kansas**

234. Defendants have entered into an unlawful agreement in restraint of trade in violation of Kansas Statutes Annotated, § 50-101, *et seq*. Defendants' combined capital, skills or acts for the purposes of creating restrictions in trade or commerce of generic Lidocaine-Prilocaine, increasing the prices of generic Lidocaine-Prilocaine, preventing competition in the sale of generic Lidocaine-Prilocaine, or binding themselves not to sell generic Lidocaine-Prilocaine, in a manner that established the price of generic Lidocaine-Prilocaine and precluded free and unrestricted competition among themselves in the sale of generic Lidocaine-Prilocaine, in violation of Kan. Stat. Ann. § 50-101, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Lidocaine-Prilocaine price competition was restrained, suppressed, and eliminated throughout Kansas; (2) generic Lidocaine-Prilocaine prices were raised, fixed, maintained and stabilized at artificially high levels throughout Kansas; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Lidocaine-Prilocaine. During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Kansas Stat. Ann. § 50-101, *et seq*. Accordingly,

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Plaintiffs and members of the Damages Class seek all forms of relief available under Kansas Stat. Ann. § 50-101, *et seq.*

**Maine**

235.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Maine Revised Statutes (Maine Rev. Stat. Ann. 10, § 1101, *et seq.*) Defendants' combination or conspiracy had the following effects: (1) generic Lidocaine-Prilocaine price competition was restrained, suppressed, and eliminated throughout Maine; (2) generic Lidocaine-Prilocaine prices were raised, fixed, maintained and stabilized at artificially high levels throughout Maine; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Lidocaine-Prilocaine. During the Class Period, Defendants' illegal conduct substantially affected Maine commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Maine Rev. Stat. Ann. 10, § 1101, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Maine Rev. Stat. Ann. 10, § 1101, *et seq.*

**Michigan**

236.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Michigan Compiled Laws Annotated § 445.771, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Lidocaine-Prilocaine price competition was restrained, suppressed, and eliminated throughout Michigan; (2) generic Lidocaine-Prilocaine

85

prices were raised, fixed, maintained and stabilized at artificially high levels throughout Michigan; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Lidocaine-Prilocaine. During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Michigan Comp. Laws Ann. § 445.771, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Michigan Comp. Laws Ann. § 445.771, *et seq*.

**Minnesota**

237. Defendants have entered into an unlawful agreement in restraint of trade in violation of Minnesota Annotated Statutes § 325D.49, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Lidocaine-Prilocaine price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) generic Lidocaine-Prilocaine prices were raised, fixed, maintained and stabilized at artificially high levels throughout Minnesota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Lidocaine-Prilocaine. During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing,

86

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Defendants have entered into an agreement in restraint of trade in violation of Minnesota Stat. § 325D.49, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Minnesota Stat. § 325D.49, *et seq.*

**Mississippi**

238.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Mississippi Code Annotated § 75-21-1, *et seq.* Trusts are combinations, contracts, understandings or agreements, express or implied when inimical to the public welfare and with the effect of, *inter alia*, restraining trade, increasing the price or output of a commodity, or hindering competition in the production and sale of a commodity. Miss. Code Ann. § 75-21-1. Defendants' combination or conspiracy was in a manner inimical to public welfare and had the following effects: (1) generic Lidocaine-Prilocaine price competition was restrained, suppressed, and eliminated throughout Mississippi; (2) generic Lidocaine-Prilocaine prices were raised, fixed, maintained and stabilized at artificially high levels throughout Mississippi; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Lidocaine-Prilocaine. During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Mississippi Code Ann. § 75-21-1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Mississippi Code Ann. § 75-21-1, *et seq.*

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Nebraska**

239.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Nebraska Revised Statutes § 59-801, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Lidocaine-Prilocaine price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) generic Lidocaine-Prilocaine prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nebraska; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Lidocaine-Prilocaine. During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Nebraska Revised Statutes § 59-801, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nebraska Revised Statutes § 59-801, *et seq*.

**Nevada**

240.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Nevada Revised Statutes Annotated § 598A.010, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Lidocaine-Prilocaine price competition was restrained, suppressed, and eliminated throughout Nevada; (2) generic Lidocaine-Prilocaine prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nevada; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition;

88

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Lidocaine-Prilocaine. During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Nevada Rev. Stat. Ann. § 598A.010, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nevada Rev. Stat. Ann. § 598A.010, *et seq*.

**New Hampshire**

241.    Defendants have entered into an unlawful agreement in restraint of trade in violation of New Hampshire Revised Statutes § 356:1, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Lidocaine-Prilocaine price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) generic Lidocaine-Prilocaine prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Hampshire; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Lidocaine-Prilocaine. During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of New Hampshire Revised Statutes § 356:1, *et seq*. Accordingly, Plaintiffs and

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

members of the Damages Class seek all relief available under New Hampshire Revised Statutes § 356:1, *et seq.*

**New Mexico**

242.    Defendants have entered into an unlawful agreement in restraint of trade in violation of New Mexico Statutes Annotated § 57-1-1, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Lidocaine-Prilocaine price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) generic Lidocaine-Prilocaine prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Lidocaine-Prilocaine. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of New Mexico Stat. Ann. § 57-1-1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Mexico Stat. Ann. § 57-1-1, *et seq.*

**New York**

243.    Defendants have entered into an unlawful agreement in restraint of trade in violation of New York's Donnelly Act, New York General Business Law § 340, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Lidocaine-Prilocaine price competition was restrained, suppressed, and eliminated throughout New York;

90

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

(2) generic Lidocaine-Prilocaine prices were raised, fixed, maintained and stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Lidocaine-Prilocaine that were higher than they would have been absent Defendants' illegal acts. During the Class Period, Defendants' illegal conduct substantially affected New York commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of the New York's Donnelly Act, New York General Business Law § 340, *et seq*. The conduct set forth above is a *per se* violation of the Act. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New York Gen. Bus. Law § 340, *et seq*.

**North Carolina**

244.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Carolina General Statutes § 75-1, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Lidocaine-Prilocaine price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) generic Lidocaine-Prilocaine prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Lidocaine-Prilocaine. During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce. As a direct

91

and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of North Carolina Gen. Stat. § 75-1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Carolina Gen. Stat. § 75-1, *et. seq*.

**North Dakota**

245.   Defendants have entered into an unlawful agreement in restraint of trade in violation of North Dakota Century Code § 51-08.1-01, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Lidocaine-Prilocaine price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) generic Lidocaine-Prilocaine prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Dakota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Lidocaine-Prilocaine. During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of North Dakota Cent. Code § 51-08.1-01, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Dakota Cent. Code § 51-08.1-01, *et seq*.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Oregon**

246.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Oregon Revised Statutes § 646.705, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Lidocaine-Prilocaine price competition was restrained, suppressed, and eliminated throughout Oregon; (2) generic Lidocaine-Prilocaine prices were raised, fixed, maintained and stabilized at artificially high levels throughout Oregon; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Lidocaine-Prilocaine. During the Class Period, Defendants' illegal conduct had a substantial effect on Oregon commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Oregon Revised Statutes § 646.705, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Oregon Revised Statutes § 646.705, *et seq*.

**Rhode Island**

247.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the Rhode Island Antitrust Act, Rhode Island General Laws § 6-36-1, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Lidocaine-Prilocaine price competition was restrained, suppressed, and eliminated throughout Rhode Island; (2) generic Lidocaine-Prilocaine prices were raised, fixed, maintained and stabilized at artificially high levels throughout Rhode Island; (3) Plaintiffs and members of the Damages

93

Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Lidocaine-Prilocaine. During the Class Period, Defendants' illegal conduct had a substantial effect on Rhode Island commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property on or after July 15, 2013, and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Rhode Island General Laws § 6-36-1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Rhode Island General Laws § 6-36-1, *et seq*.

**South Dakota**

248.   Defendants have entered into an unlawful agreement in restraint of trade in violation of South Dakota Codified Laws § 37-1-3.1, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Lidocaine-Prilocaine price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) generic Lidocaine-Prilocaine prices were raised, fixed, maintained and stabilized at artificially high levels throughout South Dakota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Lidocaine-Prilocaine. During the Class Period, Defendants' illegal conduct had a substantial effect on South Dakota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of

94

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

trade in violation of South Dakota Codified Laws Ann. § 37-1-3.1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under South Dakota Codified Laws Ann. § 37-1-3.1, *et seq*.

**Tennessee**

249.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Tennessee Code Annotated § 47-25-101, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Lidocaine-Prilocaine price competition was restrained, suppressed, and eliminated throughout Tennessee; (2) generic Lidocaine-Prilocaine prices were raised, fixed, maintained and stabilized at artificially high levels throughout Tennessee; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Lidocaine-Prilocaine. During the Class Period, Defendants' illegal conduct had a substantial effect on Tennessee commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Tennessee Code Ann. § 47-25-101, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Tennessee Code Ann. § 47-25-101, *et seq*.

**Utah**

250.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Utah Code Annotated § 76-10-3101, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Lidocaine-Prilocaine price competition was restrained,

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

suppressed, and eliminated throughout Utah; (2) generic Lidocaine-Prilocaine prices were raised, fixed, maintained and stabilized at artificially high levels throughout Utah; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Lidocaine-Prilocaine. During the Class Period, Defendants' illegal conduct had a substantial effect on Utah commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Utah Code Annotated § 76-10-3101, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Utah Code Annotated § 76-10-3101, *et seq*.

**Vermont**

251.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Vermont Stat. Ann. 9 § 2453, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Lidocaine-Prilocaine price competition was restrained, suppressed, and eliminated throughout Vermont; (2) generic Lidocaine-Prilocaine prices were raised, fixed, maintained and stabilized at artificially high levels throughout Vermont; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Lidocaine-Prilocaine. During the Class Period, Defendants' illegal conduct had a substantial effect on Vermont commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Vermont Stat. Ann. 9 § 2453, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Vermont Stat. Ann. 9 § 2453, *et seq.*

**West Virginia**

252.    Defendants have entered into an unlawful agreement in restraint of trade in violation of West Virginia Code § 47-18-1, *et seq.* Defendants' anticompetitive acts described above were knowing, willful, and constitute violations or flagrant violations of West Virginia Antitrust Act. Defendants' combination or conspiracy had the following effects: (1) generic Lidocaine-Prilocaine price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) generic Lidocaine-Prilocaine prices were raised, fixed, maintained and stabilized at artificially high levels throughout West Virginia; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Lidocaine-Prilocaine. During the Class Period, Defendants' illegal conduct had a substantial effect on West Virginia commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of West Virginia Code § 47-18-1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under West Virginia Code § 47-18-1, *et seq.*

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Wisconsin**

253.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Wisconsin Statutes § 133.01, *et seq*. Defendants' and their co-conspirators' anticompetitive activities have directly, foreseeably and proximately caused injury to Plaintiffs and members of the Classes in the United States. Specifically, Defendants' combination or conspiracy had the following effects: (1) generic Lidocaine-Prilocaine price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) generic Lidocaine-Prilocaine prices were raised, fixed, maintained and stabilized at artificially high levels throughout Wisconsin; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Lidocaine-Prilocaine.    During the Class Period, Defendants' illegal conduct had a substantial effect on the people of Wisconsin and Wisconsin commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Wisconsin Stat. § 133.01, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Wisconsin Stat. § 133.01, *et seq*.

**As to All Jurisdictions Above**

254.    Plaintiffs and members of the Damages Class in each of the above jurisdictions have been injured in their business and property by reason of Defendants' unlawful combination, contract, conspiracy and agreement. Plaintiffs and members of the Damages Class have paid

98

more for generic Lidocaine-Prilocaine than they otherwise would have paid in the absence of Defendants' unlawful conduct. This injury is of the type the antitrust laws of the above states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

255.    In addition, Defendants have profited significantly from the aforesaid conspiracy. Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of Plaintiffs and members of the Damages Class.

256.    Accordingly, Plaintiffs and members of the Damages Class in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

## THIRD COUNT

### Violation of State Consumer Protection Statutes[102]
### (on behalf of Plaintiffs and the Damages Class)

257.    Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

258.    Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

---

[102] Statutory consumer protection violations are alleged herein for the following jurisdictions: Alaska, Arkansas, California, Colorado, Delaware, District of Columbia, Florida, Georgia, Hawaii, Massachusetts, Michigan, Minnesota, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Rhode Island, South Carolina, South Dakota, Utah, Vermont, Virginia, West Virginia, Wisconsin and the U.S. Virgin Islands.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Alaska**

259.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Alaska Statute § 45.50.471, *et seq*.   Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which generic Lidocaine-Prilocaine were sold, distributed, or obtained in Alaska and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. The aforementioned conduct on the part of Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Alaska law.   Defendants' unlawful conduct had the following effects: (1) generic Lidocaine-Prilocaine price competition was restrained, suppressed, and eliminated throughout Alaska; (2) generic Lidocaine-Prilocaine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Alaska; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Lidocaine-Prilocaine. During the Class Period, Defendants' illegal conduct substantially affected Alaska commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Alaska Stat. § 45.50.471, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Arkansas**

260.   Defendants have knowingly entered into an unlawful agreement in restraint of trade in violation of the Arkansas Code Annotated, § 4-88-101, *et seq*. Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which generic Lidocaine-Prilocaine were sold, distributed, or obtained in Arkansas and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. The aforementioned conduct on the part of Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10). Defendants' unlawful conduct had the following effects: (1) generic Lidocaine-Prilocaine price competition was restrained, suppressed, and eliminated throughout Arkansas; (2) generic Lidocaine-Prilocaine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arkansas; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Lidocaine-Prilocaine. During the Class Period, Defendants' illegal conduct substantially affected Arkansas commerce and consumers. As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10) and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**California**

261.    Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of California Business and Professions Code § 17200, *et seq*. During the Class Period, Defendants manufactured, marketed, sold, or distributed generic Lidocaine-Prilocaine in California, and committed and continue to commit acts of unfair competition, as defined by § 17200, *et seq*. of the California Business and Professions Code, by engaging in the acts and practices specified above. This claim is instituted pursuant to §§ 17203 and 17204 of the California Business and Professions Code, to obtain restitution from these Defendants for acts, as alleged herein, that violated § 17200 of the California Business and Professions Code, commonly known as the Unfair Competition Law. Defendants' conduct as alleged herein violated § 17200. The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of California Business and Professions Code §17200, *et seq*., including, but not limited to, the following: (1) the violations of Section 1 of the Sherman Act, as set forth above; (2) the violations of § 16720, *et seq*. of the California Business and Professions Code, set forth above. Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether or not in violation of § 16720, *et seq*. of the California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent; (3) Defendants' acts or practices are unfair to purchasers of generic Lidocaine-Prilocaine in the State of California within the meaning of § 17200, California Business and Professions Code;

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

and (4) Defendants' acts and practices are fraudulent or deceptive within the meaning of Section 17200 of the California Business and Professions Code. Plaintiffs and members of the Damages Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that have been obtained by Defendants as a result of such business acts or practices. During the Class Period, Defendants' illegal conduct substantially affected California commerce and consumers. The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future. The unlawful and unfair business practices of Defendants, and each of them, as described above, have caused and continue to cause Plaintiffs and members of the Damages Class to pay supracompetitive and artificially-inflated prices for generic Lidocaine-Prilocaine. Plaintiffs and members of the Damages Class suffered injury in fact and lost money or property as a result of such unfair competition. The conduct of Defendants as alleged in this Complaint violates § 17200 of the California Business and Professions Code. As alleged in this Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Plaintiffs and members of the Damages Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to the California Business and Professions Code, §§17203 and 17204.

**Colorado**

262.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Colorado Consumer Protection Act, Colorado Rev.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Stat. § 6-1-101, *et seq.* Defendants engaged in an unfair and deceptive trade practices during the course of their business dealings, which significantly impacted Plaintiffs as actual or potential consumers of the Defendants' goods and which caused Plaintiffs to suffer injury. Defendants took efforts to conceal their agreements from Plaintiffs. Defendants' unlawful conduct had the following effects: (1) generic Lidocaine-Prilocaine price competition was restrained, suppressed, and eliminated throughout Colorado; (2) generic Lidocaine-Prilocaine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Colorado; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Lidocaine-Prilocaine. During the Class Period, Defendants' illegal conduct substantially affected Colorado commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Colorado Rev. Stat. § 6-1-101, *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute and as equity demands.

**Delaware**

263. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Delaware Consumer Fraud Act, 6 Del. Code § 2511, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce in Delaware, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Lidocaine-Prilocaine were sold, distributed, or obtained in Delaware. Defendants deliberately failed to disclose material facts to Plaintiffs and members of

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Lidocaine-Prilocaine. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Lidocaine-Prilocaine prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Lidocaine-Prilocaine price competition was restrained, suppressed, and eliminated throughout Delaware; (2) generic Lidocaine-Prilocaine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Delaware; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Lidocaine-Prilocaine. During the Class Period, Defendants' illegal conduct had a substantial effect on Delaware commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Lidocaine-Prilocaine, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Lidocaine-Prilocaine at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of 6 Del. Code § 2511, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**District of Columbia**

264.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of District of Columbia Code § 28-3901, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which generic Lidocaine-Prilocaine were sold, distributed or obtained in the District of Columbia. During the Class Period, Defendants' illegal conduct substantially affected District of Columbia commerce and consumers. The foregoing conduct constitutes "unlawful trade practices," within the meaning of D.C. Code § 28-3904. Plaintiffs and members of the Damages Class were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. Defendants had the sole power to set that price and Plaintiffs and members of the Damages Class had no power to negotiate a lower price. Moreover, Plaintiffs and members of the Damages Class lacked any meaningful choice in purchasing generic Lidocaine-Prilocaine because they were unaware of the unlawful overcharge, and there was no alternative source of supply through which Plaintiffs and members of the Damages Class could avoid the overcharges. Defendants' conduct with regard to sales of generic Lidocaine-Prilocaine, including their illegal conspiracy to secretly fix the price of generic Lidocaine-Prilocaine at supracompetitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public. Defendants took grossly unfair advantage of Plaintiffs and members of the Damages Class. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for purchasers so that there

106

was a gross disparity between the price paid and the value received for generic Lidocaine-Prilocaine. Defendants' unlawful conduct had the following effects: (1) generic Lidocaine-Prilocaine price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) generic Lidocaine-Prilocaine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Lidocaine-Prilocaine. As a direct and proximate result of Defendants' conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of District of Columbia Code § 28-3901, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Florida**

265.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq*. Defendants' unlawful conduct had the following effects: (1) generic Lidocaine-Prilocaine price competition was restrained, suppressed, and eliminated throughout Florida; (2) generic Lidocaine-Prilocaine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Lidocaine-Prilocaine. During the Class Period, Defendants' illegal conduct substantially affected Florida commerce and

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Florida Stat. § 501.201, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Georgia**

266. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Georgia Uniform Deceptive Trade Practices Act, Georgia Code § 10-1-370, *et seq.* and the Georgia Fair Businesses Practices Act, Georgia Code Ann. § 10-1-390, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce in Georgia, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Lidocaine-Prilocaine were sold, distributed, or obtained in Georgia. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Lidocaine-Prilocaine. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Lidocaine-Prilocaine prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Lidocaine-Prilocaine price competition was restrained, suppressed, and eliminated throughout Georgia; (2) generic Lidocaine-Prilocaine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Georgia; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Lidocaine-Prilocaine. During the Class

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Period, Defendants' illegal conduct had a substantial effect on Georgia commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above and are threatened with further injury. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Lidocaine-Prilocaine, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Lidocaine-Prilocaine at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of Georgia law, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute and as equity demands.

**Hawaii**

267.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Hawaii Revised Statutes Annotated § 480-1, *et seq.* Defendants' unlawful conduct had the following effects: (1) generic Lidocaine-Prilocaine price competition was restrained, suppressed, and eliminated throughout Hawaii; (2) generic Lidocaine-Prilocaine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Lidocaine-Prilocaine. During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce and consumers. As

109

a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Hawaii Rev. Stat. § 480-1 *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

### Massachusetts

268.   Defendants have engaged in unfair competition or unlawful, unfair, unconscionable, or deceptive acts or practices in violation of the Massachusetts Gen. Laws, Ch 93A, § 1, *et seq*. Defendants were engaged in trade or commerce as defined by G.L. 93A. Defendants, in a market that includes Massachusetts, agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which generic Lidocaine-Prilocaine were sold, distributed, or obtained in Massachusetts and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. The aforementioned conduct on the part of Defendants constituted "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce," in violation of Massachusetts Gen. Laws, Ch 93A, § 2, 11. Defendants' unlawful conduct had the following effects: (1) generic Lidocaine-Prilocaine price competition was restrained, suppressed, and eliminated throughout Massachusetts; (2) generic Lidocaine-Prilocaine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Massachusetts; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Damages Class paid supracompetitive, artificially inflated prices for generic Lidocaine-Prilocaine. During the

110

Class Period, Defendants' illegal conduct substantially affected Massachusetts commerce and consumers. As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Massachusetts Gen. Laws, Ch 93A, § 2, 11, that were knowing or willful, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute, including multiple damages.

**Michigan**

269.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Michigan Consumer Protection Statute, Mich. Compiled Laws § 445.903, *et seq*.  Defendants agreed to, and did in fact, act in restraint of trade or commerce in Michigan, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Lidocaine-Prilocaine were sold, distributed, or obtained in Michigan. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Lidocaine-Prilocaine. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Lidocaine-Prilocaine prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Lidocaine-Prilocaine price competition was restrained, suppressed, and eliminated throughout Michigan; (2) generic Lidocaine-Prilocaine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Michigan; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages

111

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Class paid supracompetitive, artificially inflated prices for generic Lidocaine-Prilocaine. During the Class Period, Defendants' illegal conduct had a substantial effect on Michigan commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Lidocaine-Prilocaine, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Lidocaine-Prilocaine at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of Mich. Compiled Laws § 445.903, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Minnesota**

270.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.43, *et seq*.  Defendants engaged in an unfair and deceptive trade practices during the course of their business dealings, which significantly impacted Plaintiffs as actual or potential consumers of the Defendants' goods and which caused Plaintiffs to suffer injury. Defendants took efforts to conceal their agreements from Plaintiffs. Defendants' unlawful conduct had the following effects: (1) generic Lidocaine-Prilocaine price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) generic Lidocaine-Prilocaine

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Minnesota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Lidocaine-Prilocaine. During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Minn. Stat. § 325D.43, *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute and as equity demands.

**Missouri**

271.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010, *et seq*. Plaintiffs and members of the Damages Class purchased generic Lidocaine-Prilocaine for personal or family purposes. Defendants engaged in the conduct described herein in connection with the sale of generic Lidocaine-Prilocaine in trade or commerce in a market that includes Missouri. Defendants agreed to, and did in fact affect, fix, control, and/or maintain, at artificial and non-competitive levels, the prices at which generic Lidocaine-Prilocaine were sold, distributed, or obtained in Missouri, which conduct constituted unfair practices in that it was unlawful under federal and state law, violated public policy, was unethical, oppressive and unscrupulous, and caused substantial injury to Plaintiffs and members of the Damages Class. Defendants concealed, suppressed, and omitted to disclose material facts

113

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Lidocaine-Prilocaine. The concealed, suppressed, and omitted facts would have been important to Plaintiffs and members of the Damages Class as they related to the cost of generic Lidocaine-Prilocaine they purchased. Defendants misrepresented the real cause of price increases and/or the absence of price reductions in generic Lidocaine-Prilocaine by making public statements that were not in accord with the facts. Defendants' statements and conduct concerning the price of generic Lidocaine-Prilocaine were deceptive as they had the tendency or capacity to mislead Plaintiffs and members of the Damages Class to believe that they were purchasing generic Lidocaine-Prilocaine at prices established by a free and fair market. Defendants' unlawful conduct had the following effects: (1) generic Lidocaine-Prilocaine price competition was restrained, suppressed, and eliminated throughout Missouri; (2) generic Lidocaine-Prilocaine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Missouri; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Lidocaine-Prilocaine. The foregoing acts and practices substantially affected Missouri commerce and consumers and constituted unlawful practices in violation of the Missouri Merchandising Practices Act. As a direct and proximate result of the above-described unlawful practices, Plaintiffs and members of the Damages Class suffered ascertainable loss of money or property. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Missouri's Merchandising Practices Act, specifically Mo. Rev. Stat. § 407.020, which prohibits "[t]he act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce…", as further interpreted by the Missouri Code of State Regulations, 15 CSR 60-7.010, *et seq*., 15 CSR 60-8.010, *et seq*., and 15 CSR 60-9.010, *et seq*., and Mo. Rev. Stat. § 407.025.

**Montana**

272. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Montana Unfair Trade Practices and Consumer Protection Act of 1970, Mont. Code, § 30-14-103, *et seq*., and § 30-14-201, *et seq*. Defendants' unlawful conduct had the following effects: (1) generic Lidocaine-Prilocaine price competition was restrained, suppressed, and eliminated throughout Montana; (2) generic Lidocaine-Prilocaine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Montana; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Lidocaine-Prilocaine. During the Class Period, Defendants marketed, sold, or distributed generic Lidocaine-Prilocaine in Montana, and Defendants' illegal conduct substantially affected Montana commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mont. Code, § 30-14-103, *et seq*., and § 30-14-201, *et. seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Nebraska**

273.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Nebraska Consumer Protection Act, Neb. Rev. Stat. § 59-1601, *et seq*.   Defendants' unlawful conduct had the following effects: (1) generic Lidocaine-Prilocaine price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) generic Lidocaine-Prilocaine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nebraska; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Lidocaine-Prilocaine. During the Class Period, Defendants marketed, sold, or distributed generic Lidocaine-Prilocaine in Nebraska, and Defendants' illegal conduct substantially affected Nebraska commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Neb. Rev. Stat. § 59-1601, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Nevada**

274.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. § 598.0903, *et seq*.   Defendants agreed to, and did in fact, act in restraint of trade or commerce in Nevada, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Lidocaine-Prilocaine were sold, distributed, or

116

obtained in Nevada. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Lidocaine-Prilocaine. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Lidocaine-Prilocaine prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Lidocaine-Prilocaine price competition was restrained, suppressed, and eliminated throughout Nevada; (2) generic Lidocaine-Prilocaine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nevada; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Lidocaine-Prilocaine. During the Class Period, Defendants' illegal conduct had a substantial effect on Nevada commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Lidocaine-Prilocaine, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Lidocaine-Prilocaine at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of Nev. Rev. Stat. § 598.0903, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**New Hampshire**

275.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Hampshire Consumer Protection Act, N.H. Rev. Stat. § 358-A:1, *et seq.*   Defendants' unlawful conduct had the following effects: (1) generic Lidocaine-Prilocaine price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) generic Lidocaine-Prilocaine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Hampshire; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Lidocaine-Prilocaine. During the Class Period, Defendants marketed, sold, or distributed generic Lidocaine-Prilocaine in New Hampshire, and Defendants' illegal conduct substantially affected New Hampshire commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. Rev. Stat. § 358-A:1, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**New Jersey**

276.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Jersey Consumer Fraud Act, N.J. Statutes § 56:8-1, *et seq.*   Defendants agreed to, and did in fact, act in restraint of trade or commerce in New Jersey, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Lidocaine-Prilocaine were sold, distributed, or

118

obtained in New Jersey. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Lidocaine-Prilocaine. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Lidocaine-Prilocaine prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Lidocaine-Prilocaine price competition was restrained, suppressed, and eliminated throughout New Jersey; (2) generic Lidocaine-Prilocaine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Jersey; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Lidocaine-Prilocaine. During the Class Period, Defendants' illegal conduct had a substantial effect on New Jersey commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Lidocaine-Prilocaine, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Lidocaine-Prilocaine at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of N.J. Statutes § 56:8-1, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

119

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**New Mexico**

277.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Mexico Stat. § 57-12-1, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices at which generic Lidocaine-Prilocaine were sold, distributed or obtained in New Mexico and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. The aforementioned conduct on the part of Defendants constituted "unconscionable trade practices," in violation of New Mexico. Stat. § 57-12-3, in that such conduct, *inter alia*, resulted in a gross disparity between the value received by Plaintiffs and members of the Damages Class and the prices paid by them for generic Lidocaine-Prilocaine as set forth in New Mexico Stat. § 57-12-2E. Plaintiffs and members of the Damages Class were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. Defendants had the sole power to set that price, and Plaintiffs and members of the Damages Class had no power to negotiate a lower price. Moreover, Plaintiffs and members of the Damages Class lacked any meaningful choice in purchasing generic Lidocaine-Prilocaine because they were unaware of the unlawful overcharge, and there was no alternative source of supply through which Plaintiffs and members of the Damages Class could avoid the overcharges. Defendants' conduct with regard to sales of generic Lidocaine-Prilocaine, including their illegal conspiracy to secretly fix the price of generic Lidocaine-Prilocaine at supracompetitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public. Defendants took grossly

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

unfair advantage of Plaintiffs and members of the Damages Class. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for generic Lidocaine-Prilocaine. Defendants' unlawful conduct had the following effects: (1) generic Lidocaine-Prilocaine price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) generic Lidocaine-Prilocaine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Lidocaine-Prilocaine. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce and consumers. As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**New York**

278.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which generic Lidocaine-Prilocaine were sold, distributed or obtained in New York and took efforts to conceal their

121

agreements from Plaintiffs and members of the Damages Class. Defendants and their co-conspirators made public statements about the prices of generic Lidocaine-Prilocaine that either omitted material information that rendered the statements that they made materially misleading or affirmatively misrepresented the real cause of price increases for generic Lidocaine-Prilocaine; and Defendants alone possessed material information that was relevant to consumers, but failed to provide the information. Because of Defendants' unlawful trade practices in the State of New York, New York class members who indirectly purchased generic Lidocaine-Prilocaine were misled to believe that they were paying a fair price for generic Lidocaine-Prilocaine or the price increases for generic Lidocaine-Prilocaine were for valid business reasons; and similarly situated consumers were affected by Defendants' conspiracy. Defendants knew that their unlawful trade practices with respect to pricing generic Lidocaine-Prilocaine would have an impact on New York consumers and not just Defendants' direct customers. Defendants knew that their unlawful trade practices with respect to pricing generic Lidocaine-Prilocaine would have a broad impact, causing consumer class members who indirectly purchased generic Lidocaine-Prilocaine to be injured by paying more for generic Lidocaine-Prilocaine than they would have paid in the absence of Defendants' unlawful trade acts and practices. The conduct of Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of consumers in New York State in an honest marketplace in which economic activity is conducted in a competitive manner. Defendants' unlawful conduct had the following effects: (1) generic Lidocaine-Prilocaine price competition was restrained, suppressed, and eliminated throughout

122

New York; (2) generic Lidocaine-Prilocaine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Lidocaine-Prilocaine. During the Class Period, Defendants marketed, sold, or distributed generic Lidocaine-Prilocaine in New York, and Defendants' illegal conduct substantially affected New York commerce and consumers. During the Class Period, each of Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed generic Lidocaine-Prilocaine in New York. Plaintiffs and members of the Damages Class seek all relief available pursuant to N.Y. Gen. Bus. Law § 349(h).

**North Carolina**

279.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which generic Lidocaine-Prilocaine were sold, distributed or obtained in North Carolina and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. Defendants' price-fixing conspiracy could not have succeeded absent deceptive conduct by Defendants to cover up their illegal acts. Secrecy was integral to the formation, implementation and maintenance of Defendants' price-fixing conspiracy. Defendants committed inherently deceptive and self-concealing actions, of which Plaintiffs and members of the Damages Class could not possibly have been aware. Defendants and their co-conspirators publicly provided pretextual and false

123

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

justifications regarding their price increases. Defendants' public statements concerning the price of generic Lidocaine-Prilocaine created the illusion of competitive pricing controlled by market forces rather than supracompetitive pricing driven by Defendants' illegal conspiracy. Moreover, Defendants deceptively concealed their unlawful activities by mutually agreeing not to divulge the existence of the conspiracy to outsiders. The conduct of Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of North Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner. Defendants' unlawful conduct had the following effects: (1) generic Lidocaine-Prilocaine price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) generic Lidocaine-Prilocaine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Lidocaine-Prilocaine. During the Class Period, Defendants marketed, sold, or distributed generic Lidocaine-Prilocaine in North Carolina, and Defendants' illegal conduct substantially affected North Carolina commerce and consumers. During the Class Period, each of Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed generic Lidocaine-Prilocaine in North Carolina. Plaintiffs and members of the Damages Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

violation of North Carolina Gen. Stat. § 75-1.1, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**North Dakota**

280.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the North Dakota Unlawful Sales or Advertising Practices Statute, N.D. Century Code § 51-15-01, *et seq*.  Defendants agreed to, and did in fact, act in restraint of trade or commerce in North Dakota, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Lidocaine-Prilocaine were sold, distributed, or obtained in North Dakota. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Lidocaine-Prilocaine. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Lidocaine-Prilocaine prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Lidocaine-Prilocaine price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) generic Lidocaine-Prilocaine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Dakota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Lidocaine-Prilocaine. During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Lidocaine-Prilocaine, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Lidocaine-Prilocaine at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of N.D. Century Code § 51-15-01, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Rhode Island**

281.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Rhode Island Unfair Trade Practice and Consumer Protection Act, R.I. Gen. Laws § 6-13.1-1, *et seq*. Members of the Damages Class purchased generic Lidocaine-Prilocaine for personal, family, or household purposes. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Rhode Island, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Lidocaine-Prilocaine were sold, distributed, or obtained in Rhode Island. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Lidocaine-Prilocaine. Defendants owed a duty to disclose such facts, and considering the relative lack of sophistication of the average, non-business purchaser, Defendants breached that duty by their silence. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Lidocaine-Prilocaine prices were competitive and fair. Defendants'

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

unlawful conduct had the following effects: (1) generic Lidocaine-Prilocaine price competition was restrained, suppressed, and eliminated throughout Rhode Island; (2) generic Lidocaine-Prilocaine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Rhode Island; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Lidocaine-Prilocaine. Defendants' illegal conduct substantially affected Rhode Island commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Lidocaine-Prilocaine, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Lidocaine-Prilocaine at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic Lidocaine-Prilocaine they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Rhode Island Gen. Laws. § 6-13.1-1, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

### South Carolina

282.     Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of South Carolina Unfair Trade Practices Act, S.C. Code

127

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Ann. § 39-5-10, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Lidocaine-Prilocaine price competition was restrained, suppressed, and eliminated throughout South Carolina; (2) generic Lidocaine-Prilocaine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Carolina; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Lidocaine-Prilocaine. During the Class Period, Defendants' illegal conduct had a substantial effect on South Carolina commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Ann. § 39-5-10, *et seq*., and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

**South Dakota**

283.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the South Dakota Deceptive Trade Practices and Consumer Protection Statute, S.D. Codified Laws § 37-24-1, *et seq*.  Defendants agreed to, and did in fact, act in restraint of trade or commerce in South Dakota, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Lidocaine-Prilocaine were sold, distributed, or obtained in South Dakota. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Lidocaine-

128

Prilocaine. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Lidocaine-Prilocaine prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Lidocaine-Prilocaine price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) generic Lidocaine-Prilocaine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Dakota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Lidocaine-Prilocaine. Defendants' illegal conduct substantially affected South Dakota commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Lidocaine-Prilocaine, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Lidocaine-Prilocaine at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic Lidocaine-Prilocaine they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. Codified Laws § 37-24-1, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

129

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Utah**

284.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Utah Consumer Sales Practices Act, Ut. Stat. § 13-11-1, *et seq*.   Members of the Damages Class purchased generic Lidocaine-Prilocaine for personal, family, or household purposes. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Utah, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Lidocaine-Prilocaine were sold, distributed, or obtained in Utah. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Lidocaine-Prilocaine. Defendants owed a duty to disclose such facts, and considering the relative lack of sophistication of the average, non-business purchaser, Defendants breached that duty by their silence. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Lidocaine-Prilocaine prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Lidocaine-Prilocaine price competition was restrained, suppressed, and eliminated throughout Utah; (2) generic Lidocaine-Prilocaine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Utah; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Lidocaine-Prilocaine. Defendants' illegal conduct substantially affected Utah commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of

130

Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above and are threatened with further injury. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Lidocaine-Prilocaine, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Lidocaine-Prilocaine at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic Lidocaine-Prilocaine they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ut. Stat. § 13-11-1 *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute and as equity demands.

**Vermont**

285.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of 9 Vermont Statutes § 2451, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Vermont, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Lidocaine-Prilocaine were sold, distributed, or obtained in Vermont. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Lidocaine-Prilocaine. Defendants owed a duty to disclose such facts, and considering the relative lack of sophistication of the average, non-business purchaser, Defendants breached that duty by their silence. Defendants misrepresented to all purchasers during the Class Period that

131

Defendants' generic Lidocaine-Prilocaine prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Lidocaine-Prilocaine price competition was restrained, suppressed, and eliminated throughout Vermont; (2) generic Lidocaine-Prilocaine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Lidocaine-Prilocaine. During the Class Period, Defendants' illegal conduct had a substantial effect on Vermont commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Lidocaine-Prilocaine, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Lidocaine-Prilocaine at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitutes unfair competition or unfair or deceptive acts or practices in violation of 9 Vt. Stat. § 2451, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Virginia**

286.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Virginia Consumer Protection Act of 1977, Va.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Code § 59.1-196, *et seq.*   Members of the Damages Class purchased generic Lidocaine-Prilocaine to be used for personal, family, or household purposes. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Virginia, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Lidocaine-Prilocaine were sold, distributed, or obtained in Virginia. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Lidocaine-Prilocaine. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Lidocaine-Prilocaine prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Lidocaine-Prilocaine price competition was restrained, suppressed, and eliminated throughout Virginia; (2) generic Lidocaine-Prilocaine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Virginia; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Lidocaine-Prilocaine. Defendants' illegal conduct substantially affected Virginia commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Lidocaine-Prilocaine, likely misled all purchasers acting reasonably under the circumstances to believe that they were

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

purchasing generic Lidocaine-Prilocaine at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic Lidocaine-Prilocaine they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Va. Code § 59.1-196, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**West Virginia**

287.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the West Virginia Consumer Credit and Protection Act, W.Va. Code § 46A-6-101, *et seq.*  Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes West Virginia, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Lidocaine-Prilocaine were sold, distributed, or obtained in West Virginia. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Lidocaine-Prilocaine. Defendants affirmatively misrepresented to all purchasers during the Class Period that Defendants' generic Lidocaine-Prilocaine prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Lidocaine-Prilocaine price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) generic Lidocaine-Prilocaine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout West Virginia; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

prices for generic Lidocaine-Prilocaine. Defendants' illegal conduct substantially affected West Virginia commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Lidocaine-Prilocaine, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Lidocaine-Prilocaine at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic Lidocaine-Prilocaine they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of W.Va. Code § 46A-6-101, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Wisconsin**

288.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Wisconsin Consumer Protection Statutes, Wisc. Stat. § 100.18, *et seq*.  Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Wisconsin, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Lidocaine-Prilocaine were sold, distributed, or obtained in Wisconsin. Defendants affirmatively misrepresented to all purchasers during the Class Period that Defendants' generic Lidocaine-Prilocaine prices were competitive

135

and fair. Defendants' unlawful conduct had the following effects: (1) generic Lidocaine-Prilocaine price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) generic Lidocaine-Prilocaine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Wisconsin; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Lidocaine-Prilocaine. Defendants' illegal conduct substantially affected Wisconsin commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations concerning the price of generic Lidocaine-Prilocaine, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Lidocaine-Prilocaine at prices set by a free and fair market. Defendants' affirmative misrepresentations constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic Lidocaine-Prilocaine they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Wisc. Stat. § 100.18, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**U.S. Virgin Islands**

289.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the U.S. Virgin Islands Consumer Fraud and Deceptive

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Business Practices Act, 12A V.I.C. §§ 102, 301-35, *et seq*.  Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes U.S.V.I., by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Lidocaine-Prilocaine were sold, distributed, or obtained in U.S.V.I. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Lidocaine-Prilocaine. Defendants affirmatively misrepresented to all purchasers during the Class Period that Defendants' generic Lidocaine-Prilocaine prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Lidocaine-Prilocaine price competition was restrained, suppressed, and eliminated throughout U.S.V.I.; (2) generic Lidocaine-Prilocaine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout U.S.V.I.; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Lidocaine-Prilocaine. Defendants' illegal conduct substantially affected U.S.V.I. commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above and are threatened with further injury. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Lidocaine-Prilocaine, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Lidocaine-

137

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Prilocaine at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic Lidocaine-Prilocaine they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 12A V.I.C. §§ 102, 301-35, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute and as equity demands.

## FOURTH COUNT

### Unjust Enrichment[103]
### (on behalf of Plaintiffs and the Damages Class)

290.    Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

291.    To the extent required, this claim is pleaded in the alternative to the other claims in this Complaint.

292.    Defendants have unlawfully benefited from their sales of Lidocaine-Prilocaine because of the unlawful and inequitable acts alleged in this Complaint. Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Lidocaine-Prilocaine at prices that were more than they would have been but for Defendants' unlawful actions.

293.    Defendants' financial benefits resulting from their unlawful and inequitable acts are traceable to overpayments by Plaintiffs and the Damages Class.

---

[103] Unjust enrichment claims are alleged herein under the laws of all States (except Ohio and Indiana) as well as the District of Columbia, Puerto Rico and the U.S. Virgin Islands.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

294.     Plaintiffs and the Damages Class have conferred upon Defendants an economic benefit, in the nature of profits resulting from unlawful overcharges, to the economic detriment of Plaintiffs and the Damages Class.

295.     Defendants have been enriched by revenue resulting from unlawful overcharges for Lidocaine-Prilocaine while Plaintiffs and the Damages Class have been impoverished by the overcharges they paid for Lidocaine-Prilocaine imposed through Defendants' unlawful conduct. Defendants' enrichment and Plaintiffs' and the Damages Class's impoverishment are connected.

296.     There is no justification for Defendants' retention of, and enrichment from, the benefits they received, which caused impoverishment to Plaintiffs and the Damages Class, because Plaintiffs and the Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.

297.     Plaintiffs and the Damages Class did not interfere with Defendants' affairs in any manner that conferred these benefits upon Defendants.

298.     The benefits conferred upon Defendants were not gratuitous, in that they constituted revenue created by unlawful overcharges arising from Defendants' illegal and unfair actions to inflate the prices of Lidocaine-Prilocaine.

299.     The benefits conferred upon Defendants are measurable, in that the revenue Defendants have earned due to their unlawful overcharges of Lidocaine-Prilocaine are ascertainable by review of sales records.

300.     It would be futile for Plaintiffs and the Damages Class to seek a remedy from any party with whom they have privity of contract. Defendants have paid no consideration to any

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

other person for any of the unlawful benefits they received indirectly from Plaintiffs and the Damages Class with respect to Defendants' sales of Lidocaine-Prilocaine.

301.    It would be futile for Plaintiffs and the Damages Class to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which they indirectly purchased Lidocaine-Prilocaine, as the intermediaries are not liable and cannot reasonably be expected to compensate Plaintiffs and the Damages Class for Defendants' unlawful conduct.

302.    The economic benefit of overcharges and monopoly profits derived by Defendants through charging supracompetitive and artificially inflated prices for Lidocaine-Prilocaine is a direct and proximate result of Defendants' unlawful practices.

303.    The financial benefits derived by Defendants rightfully belong to Plaintiffs and the Damages Class, because Plaintiffs and the Damages Class paid supracompetitive prices during the Class Period, inuring to the benefit of Defendants.

304.    It would be inequitable under unjust enrichment principles under the laws of all States (except Ohio and Indiana) and of the District of Columbia, Puerto Rico and the U.S. Virgin Islands, for Defendants to be permitted to retain any of the overcharges for Lidocaine-Prilocaine derived from Defendants' unlawful, unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

305.    Defendants are aware of and appreciate the benefits bestowed upon them by Plaintiffs and the Damages Class. Defendants consciously accepted the benefits and continue to do so as of the date of this filing.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

306. Defendants should be compelled to disgorge in a common fund for the benefit of Plaintiffs and the Damages Class all unlawful or inequitable proceeds they received from their sales of Lidocaine-Prilocaine.

307. A constructive trust should be imposed upon all unlawful or inequitable sums received by Defendants traceable to indirect purchases of Lidocaine-Prilocaine by Plaintiffs and the Damages Class.

308. Plaintiffs and the Damages Class have no adequate remedy at law.

309. By engaging in the foregoing unlawful or inequitable conduct depriving Plaintiffs and the Damages Class of the opportunity to purchase lower-priced generic versions of Lidocaine-Prilocaine and forcing them to pay higher prices for Lidocaine-Prilocaine, Defendants have been unjustly enriched in violation of the common law of various states, as outlined below:

**Alabama**

310. Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Lidocaine-Prilocaine in Alabama at prices that were more than they would have been but for Defendants' actions. Defendants received money from Plaintiffs and the Damages Class as a direct result of the unlawful overcharges, and have retained this money. Defendants have benefitted at the expense of Plaintiffs and the Damages Class from revenue resulting from unlawful overcharges for Lidocaine-Prilocaine. It is inequitable for Defendants to accept and retain the benefits received without compensating Plaintiffs and the Damages Class.

**Alaska**

311. Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Lidocaine-Prilocaine in Alaska at prices that were more than they would

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants appreciated the benefits bestowed upon them by Plaintiffs and the Damages Class. Defendants accepted and retained the benefits bestowed upon them under inequitable and unjust circumstances arising from unlawful overcharges to Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Arizona**

312.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Lidocaine-Prilocaine in Arizona at prices that were more than they would have been but for Defendants' actions. Defendants have been enriched by revenue resulting from unlawful overcharges for Lidocaine-Prilocaine. Plaintiffs and the Damages Class have been impoverished by the overcharges for Lidocaine-Prilocaine resulting from Defendants' unlawful conduct.  Defendants' enrichment and Plaintiffs' and the Damages Class's impoverishment are connected.  There is no justification for Defendants' receipt of the benefits causing their enrichment and Plaintiffs' and the Damages Class's impoverishment, because Plaintiffs and the Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges. Plaintiffs and the Damages Class have no remedy at law.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Arkansas**

313.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Lidocaine-Prilocaine in Arkansas at prices that were more than they would have been but for Defendants' actions.  Defendants received money from Plaintiffs and the Damages Class as a direct result of the unlawful overcharges, and have retained this money. Defendants have paid no consideration to any other person in exchange for this money.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**California**

314.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Lidocaine-Prilocaine in California at prices that were more than they would have been but for Defendants' actions.  Defendants have received a benefit from Plaintiffs and the Damages Class as a direct result of the unlawful overcharges.  Defendants retained the benefits bestowed upon them under inequitable and unjust circumstances at the expense of Plaintiffs and the Damages Class.

**Colorado**

315.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Lidocaine-Prilocaine in Colorado at prices that were more than they would have been but for Defendants' actions.  Defendants have received a benefit from Plaintiffs and the Damages Class in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants. Defendants have benefitted at the expense of Plaintiffs and the Damages Class. Under the

143

circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Connecticut**

316.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Lidocaine-Prilocaine in Connecticut at prices that were more than they would have been but for Defendants' actions.  Defendants were benefitted in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants have paid no consideration to any other person in exchange for this benefit.  Defendants retained the benefits bestowed upon them under inequitable and unjust circumstances at the expense of Plaintiffs and the Damages Class.

**Delaware**

317.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Lidocaine-Prilocaine in Delaware at prices that were more than they would have been but for Defendants' actions.  Defendants have been enriched by revenue resulting from unlawful overcharges for Lidocaine-Prilocaine.  Plaintiffs and the Damages Class have been impoverished by the overcharges for Lidocaine-Prilocaine resulting from Defendants' unlawful conduct.  Defendants' enrichment and Plaintiffs' and the Damages Class's impoverishment are connected.  There is no justification for Defendants' receipt of the benefits causing their enrichment, because Plaintiffs and the Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.  Plaintiffs and the Damages Class have no remedy at law.

144

**District of Columbia**

318.     Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Lidocaine-Prilocaine in the District of Columbia at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants retained the benefit bestowed upon them under inequitable and unjust circumstances arising from unlawful overcharges to Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable and unjust for Defendants to retain such benefits.

**Florida**

319.     Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Lidocaine-Prilocaine in Florida at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants appreciated the benefits bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Georgia**

320.     Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Lidocaine-Prilocaine in Georgia at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an

145

economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Hawaii**

321.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Lidocaine-Prilocaine in Hawaii at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Idaho**

322.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Lidocaine-Prilocaine in Idaho at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants appreciated the benefit conferred upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Illinois**

323.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Lidocaine-Prilocaine in Illinois at prices that were more than they would have been but for Defendants' actions. Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants retained the benefits bestowed upon them under unjust circumstances arising from unlawful overcharges to Plaintiffs and the Damages Class.  It is against equity, justice, and good conscience for Defendants to be permitted to retain the revenue resulting from their unlawful overcharges.

**Iowa**

324.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Lidocaine-Prilocaine in Iowa at prices that were more than they would have been but for Defendants' actions.  Defendants have been enriched by revenue resulting from unlawful overcharges for Lidocaine-Prilocaine, which revenue resulted from anticompetitive prices paid by Plaintiffs and the Damages Class, which inured to Defendants' benefit. Defendants' enrichment has occurred at the expense of Plaintiffs and the Damages Class.  Under the circumstances, it would be unjust for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Kansas**

325.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Lidocaine-Prilocaine in Kansas at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants retained the benefits bestowed upon them under unjust circumstances arising from unlawful overcharges to Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Kentucky**

326.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Lidocaine-Prilocaine in Kentucky at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants appreciated the benefit conferred upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Louisiana**

327.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Lidocaine-Prilocaine in Louisiana at prices that were more than they would have been but for Defendants' actions.  Defendants have been enriched by revenue resulting from unlawful overcharges for Lidocaine-Prilocaine.  Plaintiffs and the Damages Class have been impoverished by the overcharges for Lidocaine-Prilocaine resulting from Defendants' unlawful conduct.   Defendants' enrichment and Plaintiffs' and the Damages Class's impoverishment are connected.  There is no justification for Defendants' receipt of the benefits

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

causing their enrichment, because Plaintiffs and the Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.  Plaintiffs and the Damages Class have no other remedy at law.

**Maine**

328.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Lidocaine-Prilocaine in Maine at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants were aware of or appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Maryland**

329.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Lidocaine-Prilocaine in Maryland at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants were aware of or appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

149

**Massachusetts**

330.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Lidocaine-Prilocaine in Massachusetts at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants were aware of or appreciated the benefit conferred upon them by Plaintiffs and the Damages Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Michigan**

331.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Lidocaine-Prilocaine in Michigan at prices that were more than they would have been but for Defendants' actions.  Defendants have received a benefit from Plaintiffs and the Damages Class in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants. Defendants retained the benefits bestowed upon them under unjust circumstances arising from unlawful overcharges to Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Minnesota**

332.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Lidocaine-Prilocaine in Minnesota at prices that were more than they would

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants appreciated and knowingly accepted the benefits bestowed upon them by Plaintiffs and the Damages Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Mississippi**

333.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Lidocaine-Prilocaine in Mississippi at prices that were more than they would have been but for Defendants' actions.  Defendants received money from Plaintiffs and the Damages Class as a direct result of the unlawful overcharges.  Defendants retain the benefit of overcharges received on the sales of Lidocaine-Prilocaine, which in equity and good conscience belong to Plaintiffs and the Damages Class on account of Defendants' anticompetitive conduct. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Missouri**

334.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Lidocaine-Prilocaine in Missouri at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.  Defendants accepted and

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

retained the benefit bestowed upon them under inequitable and unjust circumstances arising from unlawful overcharges to Plaintiffs and the Damages Class.

**Montana**

335.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Lidocaine-Prilocaine in Montana at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Nebraska**

336.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Lidocaine-Prilocaine in Nebraska at prices that were more than they would have been but for Defendants' actions.  Defendants received money from Plaintiffs and the Damages Class as a direct result of the unlawful overcharges, and have retained this money.  Defendants have paid no consideration to any other person in exchange for this money.  In justice and fairness, Defendants should disgorge such money and remit the overcharged payments back to Plaintiffs and the Damages Class.

**Nevada**

337.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Lidocaine-Prilocaine in Nevada at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

economic benefit upon Defendants in the nature of revenue resulting from unlawful overcharges for Lidocaine-Prilocaine.  Defendants appreciated the benefits bestowed upon them by Plaintiffs and the Damages Class, for which they have paid no consideration to any other person.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**New Hampshire**

338.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Lidocaine-Prilocaine in New Hampshire at prices that were more than they would have been but for Defendants' actions.  Defendants have received a benefit from Plaintiffs and the Damages Class in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants.  Under the circumstances, it would be unconscionable for Defendants to retain such benefits.

**New Jersey**

339.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Lidocaine-Prilocaine in New Jersey at prices that were more than they would have been but for Defendants' actions.  Defendants have received a benefit from Plaintiffs and the Damages Class in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants.  The benefits conferred upon Defendants were not gratuitous, in that they comprised revenue created by unlawful overcharges arising from arising from unlawful overcharges to Plaintiffs and the Damages Class.  Defendants have paid no consideration to any other person for any of the unlawful benefits they received from Plaintiffs and the Damages Class with respect to

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Defendants' sales of Lidocaine-Prilocaine.   Under the circumstances, it would be unjust for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**New Mexico**

340.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Lidocaine-Prilocaine in New Mexico at prices that were more than they would have been but for Defendants' actions.   Defendants have knowingly benefitted at the expense of Plaintiffs and the Damages Class from revenue resulting from unlawful overcharges for Lidocaine-Prilocaine.   To allow Defendants to retain the benefits would be unjust because the benefits resulted from anticompetitive pricing that inured to Defendants' benefit and because Defendants have paid no consideration to any other person for any of the benefits they received.

**New York**

341.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Lidocaine-Prilocaine in New York at prices that were more than they would have been but for Defendants' actions.   Defendants have been enriched by revenue resulting from unlawful overcharges for Lidocaine-Prilocaine, which revenue resulted from anticompetitive prices paid by Plaintiffs and the Damages Class, which inured to Defendants' benefit.   Defendants' enrichment has occurred at the expense of Plaintiffs and the Damages Class.   It is against equity and good conscience for Defendants to be permitted to retain the revenue resulting from their unlawful overcharges.

**North Carolina**

342.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Lidocaine-Prilocaine in North Carolina at prices that were more than they

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Plaintiffs and the Damages Class did not interfere with Defendants' affairs in any manner that conferred these benefits upon Defendants.  The benefits conferred upon Defendants were not gratuitous, in that they comprised revenue created by unlawful overcharges arising from arising from unlawful overcharges to Plaintiffs and the Damages Class.  The benefits conferred upon Defendants are measurable, in that the revenue Defendants have earned due to unlawful overcharges are ascertainable by review of sales records.  Defendants consciously accepted the benefits conferred upon them.

### North Dakota

343.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Lidocaine-Prilocaine in North Dakota at prices that were more than they would have been but for Defendants' actions. Defendants have been enriched by revenue resulting from unlawful overcharges for Lidocaine-Prilocaine.  Plaintiffs and the Damages Class have been impoverished by the overcharges for Lidocaine-Prilocaine resulting from Defendants' unlawful conduct.    Defendants' enrichment and Plaintiffs' and the Damages Class's impoverishment are connected.  There is no justification for Defendants' receipt of the benefits causing their enrichment, because Plaintiffs and the Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.  Plaintiffs and the Damages Class have no

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

remedy at law.   Under the circumstances, it would be unjust for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Oklahoma**

344.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Lidocaine-Prilocaine in Oklahoma at prices that were more than they would have been but for Defendants' actions.   Defendants received money from Plaintiffs and the Damages Class as a direct result of the unlawful overcharges, and have retained this money. Defendants have paid no consideration to any other person in exchange for this money. Plaintiffs and the Damages Class have no remedy at law.   It is against equity and good conscience for Defendants to be permitted to retain the revenue resulting from their unlawful overcharges.

**Oregon**

345.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Lidocaine-Prilocaine in Oregon at prices that were more than they would have been but for Defendants' actions.   Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.   Defendants were aware of the benefit bestowed upon them by Plaintiffs and the Damages Class.   Under the circumstances, it would be unjust for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

156

**Pennsylvania**

346.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Lidocaine-Prilocaine in Pennsylvania at prices that were more than they would have been but for Defendants' actions. Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.   Defendants appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.   Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Puerto Rico**

347.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Lidocaine-Prilocaine in Puerto Rico at prices that were more than they would have been but for Defendants' actions.   Defendants have been enriched by revenue resulting from unlawful overcharges for Lidocaine-Prilocaine.   Plaintiffs and the Damages Class have been impoverished by the overcharges for Lidocaine-Prilocaine resulting from Defendants' unlawful conduct.    Defendants' enrichment and Plaintiffs' and the Damages Class's impoverishment are connected.   There is no justification for Defendants' receipt of the benefits causing their enrichment and Plaintiffs' and the Damages Class's impoverishment, because Plaintiffs and the Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.   Plaintiffs and the Damages Class have no remedy at law.

157

**Rhode Island**

348.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Lidocaine-Prilocaine in Rhode Island at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**South Carolina**

349.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Lidocaine-Prilocaine in South Carolina at prices that were more than they would have been but for Defendants' actions.  The benefits conferred upon Defendants were not gratuitous, in that they comprised revenue created by unlawful overcharges arising from arising from unlawful overcharges to Plaintiffs and the Damages Class.  Defendants realized value from the benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**South Dakota**

350.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Lidocaine-Prilocaine in South Dakota at prices that were more than they would have been but for Defendants' actions.  Defendants have received a benefit from Plaintiffs

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

and the Damages Class in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants. Defendants were aware of the benefit bestowed upon them by Plaintiffs and the Damages Class. Under the circumstances, it would be inequitable and unjust for Defendants to retain such benefits without reimbursing Plaintiffs and the Damages Class.

**Tennessee**

351.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Lidocaine-Prilocaine in Tennessee at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.  It would be futile for Plaintiffs and the Damages Class to seek a remedy from any party with whom they have privity of contract. Defendants have paid no consideration to any other person for any of the unlawful benefits they received indirectly from Plaintiffs and the Damages Class with respect to Defendants' sales of Lidocaine-Prilocaine.  It would be futile for Plaintiffs and the Damages Class to exhaust all remedies against the entities with which Plaintiffs and the Damages Class have privity of contract because Plaintiffs and the Damages Class did not purchase Lidocaine-Prilocaine directly from any Defendant.

159

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Texas**

352.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Lidocaine-Prilocaine in Texas at prices that were more than they would have been but for Defendants' actions.  Defendants have received a benefit from Plaintiffs and the Damages Class in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants.  Defendants were aware of or appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class. The circumstances under which Defendants have retained the benefits bestowed upon them by Plaintiffs and the Damages Class are inequitable in that they result from Defendants' unlawful overcharges for Lidocaine-Prilocaine.  Plaintiffs and the Damages Class have no remedy at law.

**Utah**

353.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Lidocaine-Prilocaine in Utah at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants were aware of or appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Vermont**

354.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Lidocaine-Prilocaine in Vermont at prices that were more than they would

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants accepted the benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Virginia**

355.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Lidocaine-Prilocaine in Virginia at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants were aware of the benefit bestowed upon them.  Defendants should reasonably have expected to repay Plaintiffs and the Damages Class. The benefits conferred upon Defendants were not gratuitous, in that they constituted revenue created by unlawful overcharges arising from Defendants' illegal and unfair actions to inflate the prices of Lidocaine-Prilocaine.  Defendants have paid no consideration to any other person for any of the benefits they have received from Plaintiffs and the Damages Class.

**Washington**

356.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Lidocaine-Prilocaine in Washington at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred

161

an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants were aware of or appreciated the benefit conferred upon them by Plaintiffs and the Damages Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

### West Virginia

357.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Lidocaine-Prilocaine in West Virginia at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants were aware of or appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

### Wisconsin

358.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Lidocaine-Prilocaine in Wisconsin at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Wyoming**

359.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Lidocaine-Prilocaine in Wyoming at prices that were more than they would have been but for Defendants' actions.   Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.   Defendants accepted, used and enjoyed the benefits bestowed upon them by Plaintiffs and the Damages Class.   Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**U.S. Virgin Islands**

360.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Lidocaine-Prilocaine in the United States Virgin Islands at prices that were more than they would have been but for Defendants' actions.   Defendants have been enriched by revenue resulting from unlawful overcharges for Lidocaine-Prilocaine, which revenue resulted from anticompetitive prices paid by Plaintiffs and the Damages Class, which inured to Defendants' benefit.   Defendants' enrichment has occurred at the expense of Plaintiffs and the Damages Class.   Defendants appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.   It is against equity and good conscience for Defendants to be permitted to retain the revenue resulting from their unlawful overcharges.   Plaintiffs and the Damages Class have no remedy at law.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

## XV.   **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment for the following relief:

1.     The Court determine that this action may be maintained as a class action under Rules 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable Notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Class;

2.     That the unlawful conduct, contract, conspiracy, or combination alleged herein be adjudged and decreed: (a) an unreasonable restraint of trade or commerce in violation of Sections 1 and 3 of the Sherman Act; (b) a *per se* violation of Sections 1 and 3 of the Sherman Act; (c) an unlawful combination, trust, agreement, understanding and/or concert of action in violation of the state antitrust and unfair competition and consumer protection laws as set forth herein; and (d) acts of unjust enrichment by Defendants as set forth herein.

3.     Plaintiffs and members of the Damages Class recover damages, to the maximum extent allowed under such state laws, and that a judgment in favor of Plaintiffs and members of the Damages Class be entered against Defendants jointly and severally in an amount to be trebled to the extent such laws permit;

4.     Plaintiffs and members of the Damages Class recover damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully obtained;

5.     Plaintiffs and members of the Damages Class be awarded restitution, including disgorgement of profits Defendants obtained as a result of their acts of unfair competition and acts of unjust enrichment, and the Court establish of a constructive trust consisting of all ill-

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

gotten gains from which Plaintiffs and members of the Damages Class may make claims on a *pro rata* basis;

6.      Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

7.      Plaintiffs and members of the Classes be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate;

8.      Plaintiffs and members of the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

9.      Plaintiffs and members of the Classes have such other and further relief as the case may require and the Court may deem just and proper.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

## XVI.   JURY DEMAND

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil

Procedure, of all issues so triable.

April 1, 2019                                    Respectfully submitted,


                                                 Roberta D. Liebenberg, Esquire
                                                 Fine, Kaplan and Black, R.P.C.
                                                 One South Broad Street, 23rd Floor
                                                 Philadelphia, PA 19107
                                                 (215) 567-6565
                                                 rliebenberg@finekaplan.com

                                                 **Lead Counsel for the End-Payer Plaintiffs**


Gregory S. Asciolla, Esquire                     Michael M. Buchman, Esquire
Labaton Sucharow LLP                             Motley Rice LLC
140 Broadway                                     600 Third Avenue, Suite 2101
New York, NY 10005                               New York, NY 10016
(212) 907-0700                                   (212) 577-0040
gasciolla@labaton.com                            mbuchman@motleyrice.com

Elizabeth J. Cabraser, Esquire                   James R. Dugan, II, Esquire
Lieff Cabraser Heimann & Bernstein LLP           The Dugan Law Firm, APLC
275 Battery Street, 29th Floor                   365 Canal Street, Suite 1000
San Francisco, CA 94111-3339                     New Orleans, LA 70130
(415) 956-1000                                   (504) 648-0180
ecabraser@lchb.com                               jdugan@dugan-lawfirm.com

Jayne A. Goldstein, Esquire                      Mindee J. Reuben, Esquire
Shepherd Finkelman Miller & Shah, LLP            Lite DePalma Greenberg, LLC
1625 N. Commerce Parkway, Suite 320              1835 Market Street, 27th Floor
Fort Lauderdale, FL 33326                        Philadelphia, PA 19103
(886) 849-7545                                   (267) 314-7980
jgoldstein@sfmslaw.com                           mreuben@litedepalma.com


166

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Joseph R. Saveri, Esquire
Joseph Saveri Law Firm, Inc.
555 Montgomery Street, Suite 1210
San Francisco, CA  94111
(415) 500-6800
jsaveri@saverilawfirm.com

Heidi M. Silton, Esquire
Lockridge Grindal Nauen P.L.L.P.
100 Washington Avenue South
Suite 2200
Minneapolis, MN  55401
(612) 339-6900
hmsilton@locklaw.com

Adam J. Zapala, Esquire
Cotchett, Pitre & McCarthy, LLP
840 Malcolm Road, Suite 200
Burlingame, CA  94010
(650) 697-6000
azapala@cpmlegal.com

Dena C. Sharp, Esquire
Girard Sharp LLP
601 California Street, Suite 1400
San Francisco, CA 94108
(415) 981-4800
chc@girardsharp.com

Bonny E. Sweeney, Esquire
Hausfeld LLP
600 Montgomery Street, Suite 3200
San Francisco, CA  94111
(415) 633-1908
bsweeney@hausfeld.com

## End-Payer Plaintiffs' Steering Committee

Dan Drachler, Esquire
Zwerling Schachter & Zwerling, LLP
41 Madison Avenue
New York, NY 10010
(212) 223-3900
ddrachler@zsz.com

Marc H. Edelson, Esquire
Edelson & Associates, LLC
3 Terry Drive, Suite 205
Newtown, PA 18940
(215) 867-2399
medelson@edelson-law.com

Peter Safirstein, Esquire
SAFIRSTEIN METCALF LLP
1250 Broadway, 27th Floor
New York, NY 10001
(212) 201-2845
psafirstein@safirsteinmetcalf.com

## Additional End-Payer Counsel

167

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

CERTIFICATE OF SERVICE

I hereby certify that on this 1st day of April, 2019, the foregoing Consolidated Amended End-Payer Class Action Complaint was filed with the Clerk of Court who will electronically enter this filing on the docket.  Thereafter, via ECF notifications, the filing will be served on all interested parties registered for electronic filing and be available for viewing and downloading from the Court's ECF system.


Roberta D. Liebenberg